JOAN TOETSCHINGER, INDIVIDUALLY AND AS PARENT AND NATURAL GUARDIAN OF PAUL TOETSCHINGER, A MINOR, v. THOMAS IHNOT AND ANOTHER.

250 N. W. 2d 204.

January 27, 1977—No. 44574.

*Jardine, Logan & O'Brien* and *Michael J. Healey*, for appellants.

*Murnane, Murnane, Battis & Conlin, Thomas M. Conlin*, and *James J. Boyd*, for respondents.

SHERAN, CHIEF JUSTICE.

Appeal from a judgment of the district court of Ramsey County entered in favor of defendants following an action for damages caused by an automobile accident. We affirm.

On Monday, April 3, 1972, at about 2:35 p. m., Paul Toetschinger, then 5 years and 8 months of age, sustained injuries when struck by an automobile owned by defendant Thomas Ihnot and operated with his permission and consent by his wife, defendant Candyce M. Ihnot. The collision occured near the "T" intersection where Eleventh Avenue in the Village of Maplewood meets White Bear Avenue, a protected thoroughfare. White Bear Avenue, a four-lane highway about 50 feet wide, extends in a northerly and southerly direction through the Village of Maplewood. Eleventh Avenue extends from it in an easterly direction and, including a median strip, is about 80 feet wide. These streets are relatively straight and level near the area of the accident. There are no sidewalks at or near the intersection, and no crosswalk markings for pedestrians. A Montgomery Ward & Co. storage facility surrounded by a parking area is located below street level and to the south and west of the intersection. An entranceway leading to it branches off from White Bear Avenue at a point about 35 feet south of the south curb line of Eleventh Avenue extended. Except for a few houses located south of Eleventh Avenue and east of White Bear Avenue, there are no residential or other structures in the immediate area of the accident. At the time of the accident the concrete surface of White Bear Avenue was dry and the weather was not inclement.

As the Ihnot car approached the "T" intersection from the north in the easterly south-bound lane of White Bear Avenue, Paul Toetschinger was standing between his sisters, Anne and Mary, 11 and 10 years of age, in the grass near the east curb line

of White Bear Avenue, about 20 feet south of the south curb line of Eleventh Avenue. Susan Wilke, a 9-year-old friend, was with them. They were returning to their home, situated southwest of the Montgomery Ward parking lot, from a shopping trip to a Target store located about 3 blocks east of White Bear Avenue. Laurie and Julie Johnson, 9 and 7 years of age, who went with them to the Target store, had crossed White Bear Avenue and, apparently, were proceeding into or down the entranceway to the Montgomery Ward parking area.

As defendant Candyce M. Ihnot, 23 years old at the time of the accident, approached from the north on White Bear Avenue, she was driving a 1965 Chevrolet Impala at a speed which she estimated to be about 35 miles per hour. She was in a posted 45-miles-per-hour zone. With her in the front seat were her sister, Jacqueline Gavin, an adult, and two infants. When they were about 80 to 100 feet north of the intersection, Mrs. Ihnot recognized that the four persons standing just to the east of the curb of White Bear Avenue and southeast of the intersection were children. The Johnson girls were not in sight. There were no cars parked in the area to obscure her vision and there were no distracting circumstances. Mrs. Ihnot's reaction was to withdraw her foot from the gas pedal, but she did not otherwise change her course or brake her speed. The children appeared to be in a position of safety and she assumed that they would remain there. But, just as she entered the intersection, she observed Paul suddenly leave the other children, running head down toward the west side of White Bear Avenue. Mrs. Ihnot applied her brakes and attempted to turn the vehicle to her right. She brought her car to a stop facing in a southwesterly direction about 100 feet south of the north curb line of Eleventh Avenue extended, with all but the front right portion of it at rest in the more easterly portion of the southbound lane of White Bear Avenue. Seventy-three feet of tire marks were later observed extending northerly from its front wheels where it had come to a stop. Just before she was able to bring her automobile to a stop, it collided with

Paul Toetschinger near the point of juncture of its left front fender and its bumper. He fell to the street, where he was observed near the front left door of the car by Mrs. Ihnot after she had stopped and stepped from it to give him aid. His mouth was injured and he had sustained a fractured femur of his right leg.

The six-person jury returned a special verdict, finding that the accident was caused by the negligence of Paul Toetschinger to the extent of 80 percent and by the negligence of Candyce Ihnot to the extent of 20 percent. Paul's damages were fixed at $2,500 and those of his mother at $6,600.

Post-trial motions were denied; judgment was entered for defendants, and this appeal was taken.

On this appeal it is contended:

(1)  The finding of 80-percent negligence attributable to Paul Toetschinger cannot be sustained by the evidence;

(2)  The trial court erred in giving the following instruction to the jury:

"A person confronted with an emergency through no negligence of his own, or her own, who, in an attempt to avoid the danger, does not choose the best or safest way is not negligent because of such choice unless the choice was so hazardous that a reasonable person would not have made it under like circumstances."

(3)  The trial court erred in failing to give an instruction specifically concerning knowledge of the presence of children as a circumstance affecting the duty to use reasonable care;

(4)  The trial court erred in failing to instruct the jury pursuant to Minn. St. 169.14, subd. 2, concerning maximum speed limits;

(5)  The damages returned were insufficient as a matter of law.

■ Although Paul Toetschinger was only 5 years and 8 months of age at the time of the accident, his negligence was

properly submitted to the jury by the trial court, which instructed:

"In the case of a child, reasonable care is that care which a reasonable child of the same age, intelligence, training and experience as Paul Toetschinger at the time of the accident would have used under like circumstances."

The submission of the issue, and the instruction as given, accords with the uniform holding of this court. See, Rosvold v. Johnson, 284 Minn. 162, 169 N. W. 2d 598 (1969); Pelzer v. Lange, 254 Minn. 46, 93 N. W. 2d 666 (1958); Bruno v. Belmonte, 252 Minn. 497, 90 N. W. 2d 899 (1958); Watts v. Erickson, 244 Minn. 264, 69 N. W. 2d 626 (1955); Audette v. Lindahl, 231 Minn. 239, 42 N. W. 2d 717 (1950); Eckhardt v. Hanson, 196 Minn. 270, 264 N. W. 776, 107 A. L. R. 1 (1936).

Plaintiffs urge that under the Minnesota rule the defendant must establish the level of a child's capacity as a precondition for the submission of the issue of contributory negligence. In this case, evidence was offered to show that Paul Toetschinger's mental and physical characteristics were like those of other children of his age, although he may have been more impulsive, immature and hyperactive than others. His experience with the dangers of traffic were limited, perhaps, but no more so than one would anticipate on the basis of his age. He had attended kindergarten but was apparently not considered ready for the first grade. We do not believe the situation to be different from that controlled by the authorities cited. We have given consideration to the advisability of adopting the rule, in force in some states, that children under the age of 7 years cannot be held contributorily negligent, and we have concluded that the rule to which we adhere has been so long and firmly established as to make abandonment of it at this time under the facts of this case inadvisable.

It is of course true, as stated in the dissenting opinion, that principles of stare decisis should not preclude changes which advance the administration of justice. But with respect to the prob-

lem before us, it is submitted that to reject our present rule concerning the contributory negligence of children in favor of an arbitrary declaration that children under the age of 7 years are incapable of exercising due care for their own safety would, in accordance with the analysis that follows, be unwise.

In Eckhardt v. Hanson, 196 Minn. 270, 272, 264 N. W. 776, 777, 107 A. L. R. 1, 2 (1936), the Illinois rule preferred by the dissenting opinion and the Massachusetts rule now in effect in this state were compared in this way:

"* * * Under the so-called *Illinois* rule (which is analogous to the common law rule with respect to the nonresponsibility of such young children for criminal acts), it is held that a child under seven is incapable of contributory negligence. * * * This rule has the merit of being easy to apply. However, it is arbitrary and always open to the objection that one day's difference in age should not be the dividing line as to whether a child is capable of negligence or not. Courts following the *Massachusetts* rule hold that the question of contributory negligence of a child under seven years of age is for the jury under proper instructions. * * *

\* \* \* \* \*

"Under a proper instruction the Massachusetts rule is the more sound and the one most likely to insure just result. It does not cast upon the general public any and all risks that may be created by the carelessness of a child. Still it does not go so far as to hold a child to a degree of care not commensurate with its age and experience. Under present-day circumstances a child of six is permitted to assume many responsibilities. There is much opportunity for him to observe and thus become cognizant of the necessity for exercising some degree of care. Compulsory school attendance, the radio, the movies, and traffic conditions all tend to have this effect. Under the Illinois rule a child may be guilty of the most flagrant violation of duty and still not be precluded from recovering damages for injuries suffered partly because

of such violation. *The Massachusetts rule contemplates justice for all parties, irrespective of age. Jurors, by virtue of their office, are competent to judge whether or not a child has exercised a degree of care commensurate with its age, capacity, and understanding. The Illinois rule has no basis in sound reason or logic. It is based upon an outworn historical rule of criminal law which refused to acknowledge any capacity on the part of any child under seven years of age to distinguish between right and wrong.*" (Italics supplied.)

In Squillace v. Village of Mountain Iron, 223 Minn. 8, 13, 26 N. W. 2d 197, 201 (1946), this court approved the following instruction with respect to the contributory negligence of a 6-year-old child:

"* * * Young people are not held to the same degree of care for their own safety as an adult person, but a child of six years of age is required to use some care for his own safety but is only held to the degree of care that is commonly used by children of like age and capacity."

In Audette v. Lindahl, 231 Minn. 239, 242, 42 N. W. 2d 717, 719 (1950), the authority of the trial court to decline to submit the issue of contributory negligence of a 5-year-old child to the jury in a proper case was recognized when we said:

"* * * Of course, the facts of a particular case, unlike those here, may preclude the submission of an issue of contributory negligence."

And in Watts v. Erickson, 244 Minn. 264, 269, note 2, 69 N. W. 2d 626, 629, note 1 (1955), we added:

" '* * * A child may be so young as to be manifestly incapable of exercising any of those qualities of attention, intelligence and judgment which are necessary to enable him to perceive a risk and to realize its unreasonable character.' Restatement, Torts, § 283, *comment e.*"

Although scholars are not in agreement on the question,[1] the authorities generally considered particularly reliable by this court have indicated that the rule now in effect in Minnesota is to be preferred to the rule favored in the dissenting opinion. In Prosser, Torts (4 ed.), § 32, we find this statement:

"Some courts have attempted to fix a minimum age, below which the child is held to be incapable of all negligence. * * * Below the age of seven, the child is arbitrarily held to be incapable of any negligence * * *. The great majority of the courts have rejected any such fixed and arbitrary rules of delimitation, and have held that children well under the age of seven can be capable of some negligent conduct. Undoubtedly there is an irreducible minimum, probably somewhere in the neighborhood of four years of age, but it ought not to be fixed by rules laid down in advance without regard to the particular case. As the age decreases, there are simply fewer possibilities of negligence, until finally, at some indeterminate point, there are none at all."

In 2 Harper and James, Torts, § 16.8, it states:

"The question of how old a child may be and yet have his immaturity considered does not give much trouble under the prevailing American doctrine which treats the matter as one of degree to be worked out in each case where the plaintiff is technically a minor under its individual circumstances. While theoretically there is no age at which contributory negligence is impossible, the universal view is to set an age below which a child

[1] See, Verni v. Johnson, 295 N. Y. 436, 68 N. E. 2d 431 (1946); Benning v. Schlemmer, 57 Ohio App. 457, 14 N. E. 2d 941 (1937); Keet, *Contributory Negligence of Children,* 12 Cleveland-Marshall L. Rev. 395; Starnes, *Contributory Negligence of a Minor as a Matter of Law in Missouri,* 1959 Wash. U. L. Q. 281; Wilderman, *Presumptions Existing in Favor of the Infant in Re: The Question of an Infant's Ability to be Guilty of Contributory Negligence,* 10 Ind. L. J. 427; Wilkens, *Contributory Negligence of Very Young Children,* 20 Cleveland St. L. Rev. 65; Note, 34 Ind. L. J. 511; Note, 22 N. Y. U. L. Q. Rev. 131; Note, 18 S. C. L. Rev. 648.

is held to be incapable of contributory negligence. The great majority of states have established three as the age below which they will not allow consideration of contributory negligence. Above that age, the general formula is kept flexible. Some states, however, have adopted rules of thumb * * *. In these states, children under seven are conclusively presumed to be incapable of contributory negligence * * *. Such a rule seems pretty mechanical and arbitrary."

Finally, Restatement, Torts 2d, § 283 A, comment b, reads in part:

"* * * Some courts have endeavored to lay down fixed rules as to a minimum age below which the child is incapable of being negligent * * *. The prevailing view is that in tort cases no such arbitrary limits can be fixed. Undoubtedly there is a minimum age, probably somewhere in the vicinity of four years, below which negligence can never be found; but with the great variation in the capacities of children and the situations which may arise, it cannot be fixed definitely for all cases."

Social changes since the rule with respect to contributory negligence of young children was first adopted in Minnesota are supportive of the rule. In Eckhardt v. Hanson, *supra,* decided in 1936, this court, in rejecting the Illinois rule as one derived from an ancient and improvident analogy to the common law of crimes, considered the Massachusetts rule to be more consistent with conditions of modern-day life. The opinion states (196 Minn. 274, 264 N. W. 778, 107 A. L. R. 4):

"* * * Under present-day circumstances a child of six is permitted to assume many responsibilities. There is much opportunity for him to observe and thus become cognizant of the necessity for exercising some degree of care. Compulsory school attendance, the radio, the movies, and traffic conditions all tend to have this effect."

In the 41 years which have elapsed since the Eckhardt decision was written, the exposure of young children to the hazards

of daily living and to the opportunities for instruction has been increased by such developments as preschool instruction and kindergarten; television; the proliferation of toys, including toy vehicles designed for the enjoyment of children under the age of 7; and games. To our mind, it is not accurate to say that young children are less alert to and less trained concerning many dangers which they face today than they were at the time of Eckhardt.

Concern for the interests of children of tender years underlies, to some extent at least, the decisions of courts which prefer the Illinois rule. But, under the rule as we employ it in Minnesota, the likelihood of unfairness in the application of the Massachusetts rule seems remote. The trial judge, who has the opportunity of observing the situation firsthand, can direct that the child involved, because of tender years, inexperience, or the subtleties of the danger to be apprehended, cannot be held to be contributorily negligent under the circumstances of the given case. This authority and responsibility on the part of the trial judge has been recognized in our decisions.[2] And when the case is submitted to the jury, it is to be made clear, as it was in this case, that the degree of care expected of a child is that commensurate with the age, mental capacity, and understanding of children of similar age acting under similar circumstances. See, 4 Hetland & Adamson, Minnesota Practice, Jury Instruction Guides (2 ed.) JIG II 104 G-S. This is a matter which jurors chosen from the community generally are particularly well able to assess. The natural sympathy and concern of jurors for children of tender years will make it unlikely in the ordinary case that a jury—advised of the impact of its determination of compara-

[2] See, Capriotti v. Beck, 264 Minn. 39, 117 N. W. 2d 563 (1962); Watts v. Erickson, 244 Minn. 264, 69 N. W. 2d 626 (1955); Thomsen v. Reibel, 212 Minn. 83, 2 N. W. 2d 567 (1942); Decker v. Itasca Paper Co. 111 Minn. 439, 127 N. W. 183 (1910),

tive fault[3]—will return a verdict precluding any recovery by the injured child.

Finally, the implicit premise of the Illinois rule, i. e., that children are unable to exercise due care for their own safety before reaching the age of 7, simply does not square with the way responsible people manage their affairs and those of their families in Minnesota today. We know it to be a fact that conscientious parents permit their children 5 and 6 years of age to play on sidewalks proximate to streets carrying vehicular traffic and to walk to places such as schools and stores without adult supervision and protection. If it be true that children of this age have no capacity whatever to appreciate and avoid the risks of vehicular traffic, concerned parents, best able to judge the capacity of their children, would not permit what we know to be the common practice. In this situation, the Massachusetts rule appears more consistent with the way ordinary, reasonable people conduct themselves than does the Illinois rule, which says in effect that no child under the age of 7 is able to know or appreciate danger.

A rule which arbitrarily eliminates contributory negligence as a defense either in whole or in part where the plaintiff is a child under the age of 7 makes possible gross unfairness with respect to a defendant charged with fault for an accident resulting in injury to a child of tender years. For example, if on the date of the accident the child has lived 6 years and 364 days, the defendant is held responsible for all of the damage, no matter how minimal his negligence. But if the child has reached his seventh birthday, the negligence of the plaintiff and the defendant are compared and the defendant, depending upon how serious

---

[3] Rule 49.01(2), Rules of Civil Procedure, provides as follows: "In actions involving Minn. Stat. 1971, Sec. 604.01 [comparative negligence law], the court shall inform the jury of the effect of its answers to the percentage of negligence question and shall permit counsel to comment thereon, unless the court is of the opinion that doubtful or unresolved questions of law, or complex issues of law or fact are involved, which may render such instruction or comment erroneous, misleading or confusing to the jury."

his lapse was from the standard of reasonable care, is relieved in whole or in part from responsibility. The outcome of litigation should not be permitted to depend on such a fortuitous circumstance as age alone.

■ The claim of error founded upon the giving of the emergency rule is based on the opinion of this court in Kachman v. Blosberg, 251 Minn. 224, 87 N. W. 2d 687 (1958). The difference between that case and this one lies in the fact that there the defendant became aware of the "emergency" resulting from the child's presence in the street when he was 300 feet distant from the point of impact. In this case, according to the evidence construed in the light most favorable to the defendants, Mrs. Ihnot was not aware that Paul had darted into the street until she reached the intersection, at which time she immediately applied her brakes, proceeding almost directly forward until she came to a stop within a few feet of contact. We believe that if the jury accepted this version of the facts, there was an emergency created by the impulsive act of the child, and the instruction was justified.

■ The trial court declined to give the following requested instruction (4 Hetland & Adamson, Minnesota Practice, Jury Instruction Guides [2 ed.] JIG II 103 G-S.):

"Where a person (knows) (has reason to know) that children are likely to be in the vicinity, the greater hazard created by their presence (or probable presence) is a circumstance to be considered in determining whether reasonable care was used. * * *"

There was no evidence in this case that the defendant knew or should have known that children were any more likely to be in the vicinity of this intersection than they were likely to be in the vicinity of any other of like character. White Bear Avenue is a "through-stop" highway. There are no schools or playgrounds located near it. There was no testimony indicating that the presence of children was to have been anticipated. The ab-

sence of a crosswalk leading from the east side of White Bear Avenue to its west side at the intersection has negative implications. There are no streets or other places attractive to children in the immediate vicinity of the accident. The Montgomery Ward facility situated to the southwest of the intersection is not open to the public and the parking area near it is for the convenience of its employees or others having specific business there. The situation, therefore, is not one calling for a special degree of alertness in anticipation of the presence of small children. See, Kachman v. Blosberg, *supra*; Van Asch v. Rutili, 286 Minn. 9, 174 N. W. 2d 101 (1970); Knox v. City of Granite Falls, 245 Minn. 11, 72 N. W. 2d 67 (1955); Shawley v. Husman, 247 Minn. 510, 78 N. W. 2d 60 (1956).

■ We believe that the instructions given by the trial court with respect to the matter of speed were adequate. It is agreed that the zone in which defendant was driving was a 45-miles-per-hour speed zone. In addition to instructing the jury that the driver of a motor vehicle is under a duty to keep it under reasonable control, the trial judge made specific reference to these applicable sections of the Minnesota Highway Traffic Regulation Act:

"Minnesota Statute 169.14, entitled 'Speed Restrictions', at subdivision 1, reads:

" 'Basic rule. No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. In every event speed shall be so restricted as may be necessary to avoid colliding with any person, vehicle or other conveyance on or entering the highway in compliance with legal requirements and the duty of all persons to use due care.'

"Subdivision 3 of the same section reads in part: It starts off: 'Reduced speed required. The driver of any vehicle shall, consistent with the requirements, drive at an appropriate reduced speed when approaching and crossing an intersection when special hazards exist with respect to pedestrians.'

"You are instructed that the mere presence of an intersection, although it bespeaks precaution, does not require an approaching motorist possessed of the right of way to drive at an appropriate reduced speed unless and until special hazards exist on or about such intersection with respect to pedestrians."

The trial court, although requested to do so, did not read § 169.14, subd. 2, which is as follows:

"Where no special hazard exists the following speeds shall be lawful, but any speeds in excess of such limits shall be prima facie evidence that the speed is not reasonable or prudent and that it is unlawful; except that the speed limit within any municipality shall be a maximum limit and any speed in excess thereof shall be unlawful:

"(1)    30 miles per hour in an urban district;

"(2)    65 miles per hour in other locations during the daytime;

"(3)    55 miles per hour in such other locations during the nighttime.

" 'Daytime' means from a half hour before sunrise to a half hour after sunset, except at any time when due to weather or other conditions there is not suffiicent light to render clearly discernible persons and vehicles at a distance of 500 feet. 'Nighttime' means at any other hour or at any time when due to weather or other conditions there is not sufficient light to render clearly discernible persons and vehicles at a distance of 500 feet."

This subdivision of the section has no application in view of the fact that there was a properly posted speed limit of 45 miles per hour at the accident site. Apart from this, the claim that the speed of the Ihnot vehicle exceeded 45 miles per hour is at best speculative.[4]

[4] An expert witness called by plaintiffs expressed the opinion that the Ihnot car, after Mrs. Ihnot withdrew pressure from the gas pedal, was moving at a speed of 43 miles per hour when the brakes were applied. The opinion was based upon the "coefficient of friction."

74

■ Our conclusion is to affirm the determination of the trial court. We do so upon the ground that the jury's finding with respect to the contributory negligence of Paul Toetschinger is sustained by the evidence. It could be persuasively argued that, under the unusual facts of this case, defendant Candyce M. Ihnot exercised reasonable care under the circumstances as a matter of law. In her effort to avoid colliding with the young boy running precipitately into the highway, she appears to have done everything that could reasonably be expected of her, under the circumstances.

Given our conclusion on the question of liability, it becomes unnecessary for us to consider the adequacy of the amount fixed by the jury as damages sustained by plaintiffs.

Affirmed.

YETKA, JUSTICE (dissenting).

I respectfully dissent. In my opinion four alternative bases for reversal are present. The first is the trial court's failure to instruct the jury that the likely presence of children is a factor to be considered in determining the standard of care. The second is the use of the emergency instruction. The third is that the evidence in this case is insufficient to allow a jury to find negligence on the part of the plaintiff. The fourth is the unnecessary continuation of the archaic rule followed in our state that a 5-year-old child can be held negligent in an auto-pedestrian accident.
A.  *The failure to instruct on the presence of children.*

In my opinion the trial court erred in refusing to give the following instruction (4 Hetland & Adamson, Minnesota Practice, Jury Instruction Guides [2 ed.] JIG II 103 G-S):

"Where a person (knows) (has reason to know) that children are likely to be in the vicinity, the greater hazard created by their presence (or probable presence) is a circumstance to be considered in determining whether reasonable care was used. * * *"

In this case not only were children likely to be in the vicinity but they, in fact, were. Several of the children had already

crossed the street—something that defendant should have noted. It was a foreseeable act that a little 5-year-old child might be tempted to follow those children who had already crossed the street. Moreover, the evidence shows that plaintiff here, only 5 years and 8 months of age, was slower mentally, both at home and in school, than a normal child of comparable age.

B. *The use of the emergency instruction.*

The trial court instructed the jury that the driver of the car was entitled to a consideration of the "emergency doctrine" which holds that an actor who is confronted with an emergency is not to be held to the standard of conduct normally applied to one who is in no such situation. The rationale of this rule is simply that a person may be confronted with an emergency which is not of his own making and the standard to be applied, although still that of the theoretical reasonable person, is that of a reasonable person in an emergency. See, Urban v. Minneapolis Street Ry. Co. 256 Minn. 1, 96 N. W. 2d 698 (1959); Zickrick v. Strathern, 211 Minn. 329, 1 N. W. 2d 134 (1941). The standard of reflection cannot be asked when reflection cannot be taken. See, Minder v. Peterson, 254 Minn. 82, 89, 93 N. W. 2d 699, 705 (1958). Thus, in an emergency a choice "may be mistaken and yet prudent." Kane v. Worcester Consol. Street Ry. Co. 182 Mass. 201, 202, 65 N. E. 54 (1902). The standard phrasing of the emergency rule is found in Restatement, Torts 2d, § 296:

"(1) In determining whether conduct is negligent toward another, the fact that the actor is confronted with a sudden emergency which requires rapid decision is a factor in determining the reasonable character of his choice of action.

"(2) The fact that the actor is not negligent after the emergency has arisen does not preclude his liability for his tortious conduct which has produced the emergency."[1]

---

[1] Accord, Johnson v. Townsend, 195 Minn. 107, 110, 261 N. W. 859, 861 (1935) ("* * * In [an emergency situation] the law is that one, sudden-

Fundamental to the application of this rule, however, is the finding that the emergency in which the conduct has its genesis is not of the actor's own making.[2] The comments to Restatement, Torts 2d, § 296, make this qualification strikingly clear:

"*a.* The rule stated in Subsection (1) of this Section is applicable where the sudden emergency is created in any way *other than by the actor's own tortious conduct,* as where it is created by the unexpected operation of a natural force or by the innocent or wrongful act of a third person. The fact that the emergency is created by the actor's own conduct does not prevent the rule from being applicable if his conduct is not tortious.

\* \* \* \* \*

"*d. Prior tortious conduct.* Where the emergency itself has been created by the actor's own negligence or other tortious conduct, the fact that he has then behaved in a manner entirely reasonable in the light of the situation with which he is confronted does not insulate his liability for his prior conduct. Such liability is not precluded by the fact that he has acted reasonably in the crisis which he has himself brought about. It is not his reasonable conduct in the emergency which makes him liable, but his prior tortious conduct creating the emergency." (Italics supplied in part.)

Thus, it is proper to give the instruction on emergency instances where a driver, traveling on a through high-speed highway, was suddenly confronted with a vehicle unlawfully crossing the highway from the driver's left (Zickrick v. Strathern, 211 Minn. 329, 1 N. W. 2d 134 [1941]); where a truck driver suddenly finds his brakes malfunctioning through no fault of his own (Trudeau v.

---

ly confronted by a peril, through no fault of his own, who in the attempt to escape does not choose the best or safest way, should not be held negligent because of such choice unless it was so hazardous that the ordinarily prudent person would not have made it under similar conditions.")

[2] See, e. g., Mathews v. Mills, 288 Minn. 16, 178 N. W. 2d 841 (1970); Erickson v. Quarstad, 270 Minn. 42, 132 N. W. 2d 814 (1964).

Sina Contracting Co. Inc. 241 Minn. 79, 62 N. W. 2d 492 [1954]); or where a driver while driving on the highway at night suddenly comes upon an unlighted hayrack drawn by a team of horses (Vasatka v. Matsch, 216 Minn. 530, 13 N. W. 2d 483 [1944]).

However, where the negligence of the party seeking to invoke the instruction contributed to the emergency, the instruction should not be given, such as where a driver is met with an "emergency" because he is driving at too high a speed on an icy highway (Ind v. Bailey, 198 Minn. 217, 269 N. W. 638 [1936]); or where a driver attempts to pass another car by driving on the shoulder of the road and must take sudden action because the shoulder is not as firm as he expected (Zobel v. Boutelle, 184 Minn. 172, 238 N. W. 49 [1931]).

The driver of the car here was presented with an "emergency" of her own making. No claim is made that the operation of the car once the brakes were applied was improper. The claim here is that the operation of the vehicle prior to the accident was negligent because of lack of vigilance in spotting the children and in the failure to reduce speed once their presence (and, it must be assumed, their predilections) were known. Even viewing the facts most favorably to the driver, we must accept that the jury found her negligent. The sole source of that negligence could only have been improper lookout and speed. Thus, the "emergency" was not, as the rule requires, the result of the actions of a third party.

A second limitation on the emergency doctrine is simply that there are some "emergencies" which must be anticipated. The ordinary, customary and expected movements of traffic upon public highways cannot be regarded as so perilous as to require that the emergency rule be applied in judging the reasonableness of the actions of drivers meeting such traffic, Alex v. Jozelich, 248 Minn. 27, 34, 78 N. W. 2d 440, 445 (1956). See, e. g., Seitzer v. Halverson, 231 Minn. 230, 42 N. W. 2d 635 (1950)

(child-pedestrian using crosswalk). Most importantly, drivers must anticipate the actions of children standing on the curb. Prosser states this general qualification in the following language:

"A further qualification which must be made is that some 'emergencies' must be anticipated, and the actor must be prepared to meet them when he engages in an activity in which they are likely to arise. Thus under present day traffic conditions, any driver of an automobile must be prepared for the sudden appearance of obstacles in the highway, or of other vehicles at intersections, *just as one who sees a child on the curb may be required to anticipate its sudden dash into the street,* and his failure to act properly when they appear may be found to amount to negligence." (Italics supplied.) Prosser, Torts (4 ed.), § 33, p. 170.

The case of Kachman v. Blosberg, 251 Minn. 224, 87 N. W. 2d 687 (1958), is one of the cases cited by Prosser for this principle. In Kachman, this court was presented with a set of facts virtually identical to those before us now and stated (251 Minn. 232, 87 N. W. 2d 694):

"* * * This court has expressed the view (Carlson v. Sanitary Farm Dairies, Inc. *supra*) that, where children are known or may reasonably be expected to be in the vicinity, a degree of vigilance commensurate with the greater hazard created by their presence or probable presence is required of a driver to measure up to the standard of what the law regards as ordinary care. It is but a restatement of the rule that ordinary care is the exercise of a degree of care commensurate with the circumstances.

"That an automobile driver can run down a child in plain sight of him without liability is not the law in this state. Mr. Justice Stone speaking for the court in Weasler v. Murphy Transfer & Storage Co. 167 Minn. 211, 213, 208 N. W. 657, 658, said:

'If there is one cause which, more than any other, should lead to the exercise of a high degree of care by an automobile driver,

it is the presence of children in such a situation that any combination of action on their part and his can result in injury to them.'

"One of the elements of the issue of defendant's negligence in this unfortunate accident is whether or not defendant was guilty of negligence in approaching so near to Terresa before applying his brakes that it was impossible for him to control his car and avoid a collision. He had seen the children ahead of him, on the edge of the highway, for a distance of at least 300 feet. He must have observed that they were children. It was a fact question whether or not under the circumstances defendant was guilty of negligence in failing to keep a proper lookout and to have his car under sufficient control to avoid a collision which he could foresee the movement of the children might precipitate. The presence of Terresa upon the highway called for greater caution from defendant than if she had been an adult. *Any careful driver will always regard the presence of a child in the street as a warning. The impulsiveness of childhood and youth is known to everyone; that they may be moved by sudden change of mind or act pursuant to a peculiar design wholly unexpected by others should be familiar to every driver of an automobile.* As was said in Olesen v. Noren, 161 Minn. 113, 115, 201 N. W. 296:

" '* * * They are innocent, sometimes bent on innocent mischief, free from care, and at times unconscious of impending dangers. These peculiarities of childhood are common and if unappreciated by automobile drivers, who use our streets, they will be duly appreciated by the persons who sit in the jury box.' " (Italics supplied.)

Thus an impulsive act on the part of a child standing beside a road is not so exceptional that a reasonable driver would not prepare for it. This is not a case for the application of the emergency rule for the reason stated in Kachman (251 Minn. 235, 87 N. W. 2d 695) :

"* * * We have said that the sudden-emergency rule is inapplicable unless it be first determined that there existed a real peril, to which the party seeking its protection did not contribute by his own want of care, and that the rule cannot be successfully invoked by a party who has brought the emergency upon himself or who has failed in the application of due care to avoid it. Therefore any act, or failure to act, amounting to a lack of due care defeats the right to claim the benefit of the emergency rule. * * *

"It seems obvious to us that the defendant brought on the emergency by driving at the speed he did after he had observed the children on the edge of the highway and by failing to keep a proper lookout and make a timely application of his brakes in order to sooner bring his car under control. As the evidence stands defendant did choose the best and safest way in his attempt to avoid colliding with Terresa upon the highway and would undoubtedly have succeeded except for the speed he was traveling when he first made an application of his brakes. He took his foot off the accelerator when he saw the children on the edge of the highway 300 feet up ahead. In doing so he must have anticipated some movement by the children. He did not apply his brakes to slow up his speed of 45 to 47 miles per hour until some 60 feet from Terresa. Had he been going more slowly he would have avoided the accident. He operated a skidding car for a distance of 62 feet because of his speed. Bakken v. Lewis, 223 Minn. 329, 26 N. W. (2d) 478; Hutzler v. McDonnell, 239 Wis. 568, 2 N. W. (2d) 207; 13 Dunnell, Dig. (3 ed.) § 6972a.

"Upon the evidence we see no basis for an application of the sudden-emergency doctrine. We think it obvious that, if defendant had kept a proper lookout and made timely application of his brakes in reduction of his speed, he would not have found himself overtaken by the emergency of which he now complains."

C. *The evidence was insufficient as a matter of law to indicate that the plaintiff in this case understood the nature of hazard.*

The "reasonable person" standard, per se, does not apply to children. They are not held, as are adults, to meet the theoretical community standard in spite of any personal inadequacies. An adult who falls short of the standard of the reasonable person, for whatever reason, acts at his peril.

The same standard of strictness, however, does not apply to children. The care demanded of an infant is only that of a child of like age, experience, and intelligence. Thus, even if the the so-called Massachusetts rule is to be applied, there must be a sufficient showing of the capacities of the child in question. The standard is not that of the ordinary child of 5 years and 8 months, but rather that of Paul Toetschinger.

One applicable test is set forth in Watts v. Erickson, 244 Minn. 264, 268, 69 N. W. 2d 626, 629 (1955):

"While it is apparent from the record that the trial court attempted to follow substantially the [Massachusetts rule], it is our opinion that, before the issue of contributory negligence of plaintiff was submitted, the jury should have had some information with reference to the experience, intelligence, maturity, training, and capacity of plaintiff. The child did not appear as a witness, and, as far as we can learn from the record, about the only information the jury had with reference to those matters was whatever observations it may have taken of plaintiff when he was around the courtroom. In other words, there was no showing of the qualifications of this particular child, such as experience in crossing streets, the amount of traffic instructions he had received in his home, and his general intelligence, knowledge, or experience, except the reference made by his mother. For example, one child of the same age as another may distinguish, understand, or recognize a danger which the other would not. Environment, locale, and home and school training all may enter into the picture. A child reared in a large city may be alert to, and be perfectly capable of recognizing or avoiding, the dangers of heavy traffic on crowded streets but oblivious to the dangers

of complicated farm machinery while visiting his country cousin. On the other hand, a child of the same age and average intelligence reared on a farm may be very keen as to the dangers of a power mower, a tractor, or other farm machinery but not instinctively conscious of traffic and other dangers found in a large urban center.

"It is our opinion under the record here that a new trial should be granted so that the jury may be more completely informed as to the experience, training, and intelligence of plaintiff before it attempts to pass on the question of his contributory negligence. This is particularly true of children under kindergarten or school age who have not yet had the opportunity to receive school safety instructions and training."

Based on this standard, I would hold as a matter of law that Paul Toetschinger was unable to appreciate the dangers with which, it is now charged, he wantonly confronted. See, e. g., Thomsen v. Reibel, 212 Minn. 83, 2 N. W. 2d 567 (1942); Decker v. Itasca Paper Co. 111 Minn. 439, 127 N. W. 183 (1910). He could neither read nor write. He lived in an area which consisted mostly of open fields. And, most importantly, the record indicates his mental development was less than other children his age. The mind of a child of 5 years and 8 months is delicate enough, but here the record indicates we are dealing with a standard less than that, perhaps less than 5 years. I cannot hold that this child could be guilty of contributory negligence. The law cannot impose a duty which cannot be met.

D. *The unnecessary continuance of the rule which allows a finding of negligence on the part of a 5-year-old child.*

In refusing to adopt the rule that children under the age of 7 cannot be held contributorily negligent, the majority opinion rests its decision squarely on the doctrine of stare decisis. As weighty as that doctrine may be, however, I feel that its full application here is inappropriate.

An overruling of our previous decisions which adopt the Massachusetts rule cannot be undertaken lightly. The doctrine of

stare decisis is, indeed, one of the most important in the law. In its simplicity it expresses reverence for civil authority and the expression of the people's expectation that government be administered with great care and with a reasonable degree of consistency, and their confidence that it be so. And it involves the injunction that official functionaries shall not for light reasons abandon the expressed judgments of themselves or of their predecessors, especially if any serious embarrassment of social order may be the consequence. For this simple reason, their judgments are entitled respect and reverence.

Stare decisis, however, is not an inflexible *rule* of law but rather a *policy* of the law. See, Johnson v. Chicago, B. & Q. Railroad Co. 243 Minn. 58, 68, 66 N. W. 2d 763, 770 (1954). And there are certain well-recognized limitations to the policy. The strictness with which the policy is followed is measured by the nature of the case. Ibid. In instances where the earlier opinion announced a rule fixing the status of property or affecting the title to real estate,[3] the court should continue to adhere to the previous rule even though it thinks that the rule is antiquated in practice because of changed conditions. In such an instance, the decision whether to make the needed reform is properly within the sole domain of the legislature. This is because the fabric of our economic system is interwoven so closely with the ownership of property that stability in this regard is of the utmost importance. Similarly, when the rules announced in the previous decisions have entered the general life of the people, and contracts are made on the faith of the rules, or if they have given rise to standards of trade or customs, the *policy* of stare decisis should apply with all its vigor.

When, however, the prior decisions do not relate to titles, establish rules of trade, property, or contract, or fall into similar

---

[3] See, e. g., Messerschmidt v. Baker, 22 Minn. 81, 84 (1875). See, also, In re Trust Created by Moulton, 233 Minn. 286, 303, 46 N. W. 2d 667, 676 (1951).

categories and after full deliberation a court decides that through lapse of time and change of conditions those rulings so relied upon become inapplicable, it should not hesitate to make its decisions coextensive with the mores of the day. To do otherwise would be to invite governance by the dead hand of the past. In the phrasing of Justice Cardozo:[4]

"* * * But I am ready to concede that the rule of adherence to precedent, though it ought not to be abandoned, ought to be in some degree relaxed. I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. We have had to do this sometimes in the field of constitutional law. Perhaps we should do so oftener in fields of private law where considerations of social utility are not so aggressive and insistent. There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years. In such circumstances, the words of Wheeler, J., in Dwy v. Connecticut Co., 89 Conn. 74, 99, express the tone and temper in which problems should be met: 'That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. Change of this char-

---

[4] Cardozo, The Nature of the Judicial Process, p. 150.

acter should not be left to the legislature.' If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors."

In the case before us we are favored with a request for the application of a humane rule to the actions of children. The majority opinion rejects this rule on the basis that this court in past years and past circumstances has decided the question adverse to the appellants position. I cannot agree. It is time for a change.

The rule which we consider is not one of property nor one of contract, nor one of trade custom, but rather one of personal rights. There can be slight concern here that a deliberate change of course may undo any solemn transactions. Neither property rights nor contracts nor customs of trade will be any less sound if the change is made. Most importantly, it cannot be said that this rule has entered the common affairs of the people to the extent that action is taken in reliance on the rule. The driver of a car does not turn his wheel or apply his brakes in reliance on any rule that, should his actions become errant, liability may or may not be imposed upon him because of the age of the pedestrian he might strike. We are concerned here instead with the just division of those losses in a manner most consistent with public policy. Thus, a considered and deliberate change in policy here, while it cannot be undertaken lightly or considered without the full import of its ends, is not beyond the ambit of our abilities.

I am of the opinion that changes of social condition and policy which have taken place since the adoption of the Massachusetts rule in our state are such that the continued and systematic application of that policy no longer serves the general welfare.

The adoption of the rule in this state was not a choice easily made. Obvious anguish attended the decision. The first opportunity this court had to discuss specifically whether a child under the age of 7 years could be held guilty of contributory negligence was in dictum in Decker v. Itasca Paper Co. 111 Minn. 439, 127

N. W. 183 (1910), a case in which we held that as a matter of law a 5-year-old child who was killed while playing near a storage elevator could not have appreciated the danger. In that case the court stated (111 Minn. 444, 127 N. W. 184):

"Decedent was a little past five years old, a bright boy, and shown to have possessed the intelligence usually found in children of that age. The question whether a child under the age of seven years, and therefore, under express law, incapable of committing a crime, may be held guilty of contributory negligence, has been presented to the courts of the several states with varying results. The conclusions reached are conflicting. In some jurisdictions the question is tested by the mental capacity of the child and the character of the danger confronting him, while in others the rule of the criminal law is applied. In the latter jurisdictions it is maintained that if a child is, by reason of his age, deemed incapable of crime, for the same reason he should be held incapable of forming opinions or appreciating risks and dangers with which he may come in contact.

"The question is not free from doubt. There is force and merit to both sides of the question. A child of six or seven years of age might be shown to have possessed the necessary intelligence to comprehend, or to have received warnings and instructions concerning a particular danger, and be chargeable with contributory negligence when injured from such danger. On the other hand, a child of the same age, but of less intelligence, and without warnings, might well be held, as a matter of law, free from fault and incapable of apprehending the dangers before him. And again, if incapable of forming the intent essential to the commission of a crime, it is a little difficult to perceive the reason for charging him with intelligence enough to comprehend the dangers of personal injury."

The question was not squarely decided for the first time until 1936 when this court adopted the so-called Massachusetts rule in Eckhardt v. Hanson, 196 Minn. 270, 264 N. W. 776, 107

A. L. R. 1 (1936). The text of the Eckhardt case sets forth the general arguments in favor of each rule (196 Minn. 272, 264 N. W. 777, 107 A. L. R. 2):

"This appeal squarely raises the question of whether a child under seven years of age can ever be guilty of contributory negligence. Under the so-called *Illinois* rule (which is analogous to the common law rule with respect to the nonresponsibility of such young children for criminal acts), it is held that a child under seven is incapable of contributory negligence. [Citations omitted.] This rule has the merit of being easy to apply. However, it is arbitrary and always open to the objection that one day's difference in age should not be the dividing line as to whether a child is capable of negligence or not. Courts following the *Massachusetts* rule hold that the question of contributory negligence of a child under seven years of age is for the jury under proper instructions. * * *

"In Minnesota neither rule has been definitely adopted."

On the basis of precedent, and its supposed affixation to our law, the Massachusetts rule was followed in the decisions of our court to date.[5] Based on these decisions, the majority would refuse to apply the rule offered. I cannot agree.

In its stead I would propose the adoption of the rule that (1) children under the age of 7 years are conclusively presumed to be incapable of contributory negligence, and (2) that a child from 7 to 14 years of age is presumed to be incapable of contributory negligence until such presumption is rebutted. I would only apply the ordinary rules of negligence to children beyond the age of 14.

---

[5] See, e. g., Carlson v. Sanitary Farm Dairies, Inc. 200 Minn. 177, 273 N. W. 665 (1937); Forseth v. Duluth-Superior Transit Co. 202 Minn. 447, 278 N. W. 904 (1938); Audette v. Lindahl, 231 Minn. 239, 42 N. W. 2d 717 (1950); Bruno v. Belmonte, 252 Minn. 497, 90 N. W. 2d 899 (1958); Pelzer v. Lange, 254 Minn. 46, 93 N. W. 2d 666 (1958).

The justifications for such a decision, in my mind, are several. First, the adoption of this rule would add a humane measure of certainty to the treatment of personal injury actions involving children. Commentary and court decisions[6] critical of the rule I would adopt stress that the use of a conclusive presumption would leave the public open to the wanton acts of children without opportunity for recourse. The simple fact of the matter, however, is that such a classification is just one of many which have children as their subject and look to the public conscience as their final arbiter. A child, upon turning 18, for example, may vote. Some persons of this age may not be ready to fully appreciate that right while others might make cogent use of it at an earlier age, but are not allowed the opportunity. Yet no serious claim is ever made that the granting of the right to vote must be made on an individual basis. One reason, among others, is simply that the collective experience of our governance system at that time in our existence felt that setting the limit at 18 provided the balance at which the competing interests met in equipoise. At a previous time the point had been 21 years, or 19 years. The same can be said for the setting of the legal age of reason for the ability to choose a guardian at 14, or the capacity to commit a crime at 14. See, Minn. St. 609.055. The last example is, I feel, particularly pertinent. The exact argument which is raised against the setting of the age at which a child can be held negligent at 7, can be made against the setting of the age at which a child can commit a crime at 14. The argument is not made that by so doing we will be opening the treasures of society, unguarded, to the reach of every small grasping hand. Again, the reason is that, in balance, when the competing forces are placed one against the other the public conscience has placed the balance at 14.

In the type of case now before us we are asked to devolve the rules which shall govern the conduct of young children. A point

---

[6] See, Eckhardt v. Hanson, 196 Minn. 270, 264 N. W. 776, 107 A. L. R. 1 (1936). See, also, Prosser, Torts (4 ed.), § 32, p. 154.

must be set. In the tender years of childhood there is a zone where it can be said that reasonable minds of that day cannot differ, and that, as a matter of law, children must be held incapable of contributory negligence. The Massachusetts rule, which I would jettison, puts the point of reason afloat on an uneasy sea of circumstance, often difficult to appreciate and susceptible of far-ranging results.

Instead, I would have it set at 7, on a policy decision that the collective experience of our community mandates, in my eyes, that children below the age of 7 do not command either the experience or the growth of mind to appreciate the dangers of 2-ton steel vehicles and their death-pronouncing force. It may be a simple matter for a person seemingly possessed of the deep eyes of wisdom to fathom the rigors which throw themselves before a child of tender years. Yet we must, by necessity, dissolve the years which divide us all from children 5 years and 8 months old. Remove the ability to read and all the information which it renders; remove the discipline of mind and body which flow from schooling; and remove a great appreciation of danger. I believe that a child who, in all likelihood, can't spell "car" or read "STOP" is entitled to greater protection than the Massachusetts rule, as pristine as it may appear in theory, can ever supply in practice. In this regard, one commentator on the subject has stated in 1935 (Wilderman, *Presumptions Existing in Favor of the Infant in Re: The Question of an Infant's Ability to be Guilty of Contributory Negligence*, 10 Ind. L. J. 427, 435):

"The majority of the states set an arbitrary age limit below which no infant can be held guilty of contributory negligence. The minority sends every case to the jury except where the facts are undisputed and can result in but one conclusion. Age is the only fact considered by the majority. The minority treat age as just one of the many facts to be considered by the jury in settling that particular case before the court.

"Which view is preferable? Under which view is the infant accorded the greater amount of protection?

"The writer accepts the majority view for the following reasons: The majority view is administratively expedient. The possible danger of a shifting standard is avoided. The confusion and inconsistency which oftimes mark jury decisions is eliminated. The law is crystallized and defined. The application of the majority view is simple.

"The majority view in setting an arbitrary age attaches full significance to the fact that infants as a class lack that judgment and discretion which comes with age and experience. While the infant may have knowledge of the possibility of injury when he runs in front of a moving trolley, the writer contends that he fails to consider the full consequences, the immediacy of the danger and the severity of the consequences. The infant acts on impulse. Seldom, if ever, does the infant stop to consider the full consequences of any act. The possibility that he may be crippled for life or even killed is not appreciated. All that concerns the infant is his present desire. Deliberation and a sensible choice of alternatives in the light of future consequences are not the attributes of one of tender years.

"The minority view fails to give adequate protection against this youthful deficiency in judgment and discretion. The tendency of the jury in considering the case before it is to attach importance to the fact whether or not the infant had knowledge of the possibility of present danger. The juror is impressed with the immediate facts and the infant's conduct in relation thereto and may not, unless clearly instructed by the court, go beyond those facts which are brought to his attention. The juror fails to consider whether or not the infant plaintiff would have done what he did in this case had he the ability to temper his impulsive action with the judgment and discretion which comes with age and experience. The public charge of tomorrow demands present protection.

"The negligent defendant placed the injurious force in opera-

tion. The infant was injured as a result of the defendant's acts. The courts are cognizant of the fact that the infant is not fully able to take care of himself and as a result has set a different standard of care for the infant than it has for the adult. If we agree that infants as a class are to be treated with leniency, why should we strive to relieve a negligent defendant whose only claim to be absolved from liability is based on the alleged fault of that group whom we seek to protect? This argument is practically sound. The complications of modern civilization with its crowding traffic and premium on speed has lessened the odds in favor of safety for infants. Why decrease these odds any further by favoring that negligent adult who initiated the injurious force with knowledge of its capacity to do harm?"

While the adoption of a conclusive presumption may offer protection to more than is needed, any potential for mischief which may result seems slight in comparison. Critics of this rule, as their main argument, contend that somehow society will be subjected to a rash of unchallenged, wanton behavior by children. I do not see, however, the source of that threat. The rule I would adopt only speaks of the acts of the children themselves. It would not release parents or other persons who through their own inadvertence place a child in a position of peril it may not appreciate. Nor would it encompass intentional acts of purposeful destruction on the part of the child, for which the child or the parent may be answerable. Any danger resulting from overinclusion is, I feel, largely illusory.

Moreover, the age of 7 is not so arbitrary as critics of such a rule would believe. That the common law[7] and the civil law,[8] as

---

[7] See, 4 Blackstone, Commentaries, 22-24.

[8] 1 Austin, Jurisprudence (5 ed.) p. 492, in discussing the case of infants under 7 states: "Here, according to the Roman Law, and (semble) according to our own, the infant is presumed *juris et de jure* incapable of unlawful intention or culpable inadvertence. His incapacity is inferred or presumed from the age wherein he is; and proof to the con-

well as jurisprudence generally,[9] treat children below the age of 7 and from 7 to 14 with varying standards reinforces rather than weakens this argument. It represents a formidable reservoir of experience. While the balance in earlier years may at times have been crudely balanced, the collective judgment which they represent should not be so lightly disregarded, as imperfectly expressed as it may have been.

Indeed, modern psychology tends to reinforce the age of 7 as one of divisional importance. As noted by Justice McAllister in an exceptionally well-considered opinion endorsing the adoption of the rule I propose (Tyler v. Weed, 285 Mich. 460, 473, 280 N. W. 827, 832 [1938] [dissenting in part]):

"What is there in actual fact, science, or research to justify a different treatment of children under the age of seven years from those that have passed this age? One cannot fail to be impressed with the fact that these conclusions which crystalized centuries ago regarding the special status of a child of this age, have been confirmed by present day observers and scientists in the specialized field of child care, education and psychology. In recent times, the studies of Alfred Binet, in France, Hans Gross, in Austria, Jean Piaget, in Switzerland, and Maria Montessori, in Italy, have brought a new light upon the mysterious mind of the child, and have elucidated many of the obscure areas in the understanding of mental development and growth in infancy and adolescence.

"What is remarkable in the conclusions arrived at by such research, is the fact that the age of seven years marks a transitional line in the mental development of children. In the copious and rich literature devoted to the subject, there repeatedly recurs the emphasis upon this age as marking the inception of thought

---

trary of that pre-appointed inference is not admissible by the tribunals."

[9] 4 Pound, Jurisprudence, pp. 311 to 331 (treatment of minority as a disability in the law in ancient as well as present common law and civil law countries).

and reason, the commencement of exchange of ideas, the beginning of concepts of justice. Authorities hold that this age marks the passage from the period of self-centered speech and thought to verbal understanding and social thought and cooperation. In short, the age of seven years can be said to be the threshold over which a human being passes from the realm of imagination and dream to the world of reality and fact.

"Dr. Hans Gross, late professor of law of the Universities of Prague and Vienna, former judge of the law courts of Austria, and pre-eminent examining magistrate of Europe, referred to by Dean Wigmore as the scholar who has done more than any other man in modern times to encourage the application of science to judicial proof, says:

" 'Because the child is in the process of growth and development of its organs, because the relations of these to each other are different and their functions are different, it is actually a different kind of being from the adult. When we think how different the body and actions of the child are, how different its nourishment, how differently foreign influences affect it, and how different its physical qualities are, we must see that his mental character is also completely different.' Criminal Psychology, A Manual for Judges, Practitioners and Students, Hans Gross, p. 364, The Modern Crime Science Series, Boston, 1918.

" 'We cannot place ourselves at the point of view of the child; it uses indeed the same words as we do, but these words convey to it very different ideas. Further, the child perceives things differently from grown-up people. The conceptions of magnitude, great or small, of pace—fast or slow, of beauty and ugliness, of distance—near or far, are quite different in the child's brain, from in ours; still more so when facts are in question. * * * The horizon of the child being much narrower than ours, a large number of our perceptions are outside the frame within which alone the child can perceive. We know, within certain limits, the extent of this frame. * * * But in many directions we do not

know the exact point where its faculty of observation commences or stops. At times we cannot explain how it does not understand something or other, while at other times we are astonished to see it find its bearings easily among matters thought to be well beyond its intelligence.' Criminal Investigation, A Practical Textbook for Magistrates, Police Officers and Lawyers, p. 62, Hans Gross, London, 1924.

"'To judge a child according to the standard and from the viewpoint of an adult is unjust, for the difference between the adult and the child is not to be sought in the immaturity and experience of the child; nor does the child differ from the adult by reason of its small knowledge and narrow outlook; he is a being with needs of his own and a mentality adapted to his needs."

If there is any reason for arbitrary age qualifications or disabilities in law, they would certainly be as capable of justification when used in the protection of little children from wrongs.

In the area of auto-pedestrian accidents the legislature has already performed our task for us. The enactment of the Minnesota No-Fault Automobile Insurance Act eliminates, for the most part, the issue of fault on the part of a pedestrian who is hit by a motor vehicle covered by the act. See, Minn. St. 65B.46. That determination should hasten rather than impede our decision here.

In sum, I am of the opinion that the mores of our day, the collective experience of our culture, the sciences and the basic ends of public welfare mandate that we adopt a conclusive presumption that children under the age of 7 cannot be contributorily negligent. I feel that the abolishment of that rule is long overdue. It might have had some relevance in the nineteenth century when children's main exposure to traffic danger was the horse and buggy, and when our knowledge of human behavior and psychiatry and the mental testing of individuals was in its infancy, but it has no relevancy today at all.

I do not urge the reversal of our previous decisions lightly. However, with all due respect given to the doctrine of stare

decisis, it cannot ask that we make the same mistake twice. The law is a living thing. It must be stable, but it cannot stand still.

SCOTT, JUSTICE (dissenting in part).

I agree with the dissent of Mr. Justice Yetka to the extent that we adopt a conclusive presumption that children under the age of 7 cannot be contributorily negligent, on the basis that the law should not impose a duty that cannot be met.

KELLY, JUSTICE (dissenting in part).

I join in the dissents of Mr. Justice Yetka and Mr. Justice Scott as to the proposed adoption of a conclusive presumption that children under 7 years of age cannot be contributorily negligent.

TODD, JUSTICE (dissenting in part.)

I join in the dissent of Mr. Justice Yetka on both the issues of error in giving the emergency instruction and adopt his views as to the conclusive presumption of non-negligence for children under 7 years of age.