Lee Ann GRYC, by her mother and natural guardian, Jacquelyn Gryc, and Jacquelyn Gryc, individually, Respondents,

v.

DAYTON–HUDSON CORP. et al., Defendants,

Riegel Textile Corp., Appellant.

Nos. 49334, 49525.

Supreme Court of Minnesota.

May 23, 1980.

Rehearing Denied July 10, 1980.

Certiorari Denied Oct. 20, 1980.

See 101 S.Ct. 320.

Jardine, Logan & O'Brien, Donald M. Jardine and Kent E. Charpentier, St. Paul, Peterson, Holtze & Treat, Robert C. Holtze, and Todd M. Henshaw, Minneapolis, for appellant.

Webster, Baldwin & Williams, Richard Baldwin, and John F. Cook, St. Paul, for Gryc; David G. Owen, University of South Carolina, Columbia, S. C., of counsel.

James R. Tschida, St. Paul, Gustafson, Gustafson & Adams and Ronald L. Snelling, Edina, for respondents.

TODD, Justice.

On December 8, 1969, Lee Ann Gryc, then 4 years of age, was clothed in pajamas made from a cotton material manufactured by defendant Riegel Textile Corporation (Riegel). The material was commercially known as "flannelette." It was not treated but did meet the minimum federal standards of product flammability. Lee Ann reached across the electric stove in her home to shut off a timer. Her pajamas were instantly ignited and she received severe burns over her upper body. The jury found Riegel liable for these injuries and awarded Lee Ann $750,000 in compensatory damages and $1,000,000 in punitive damages. We affirm.

At the time of the incident, the Gryc family consisted of Gerry Gryc, his wife Jacquelyn, and their two children, Tammy, age 6, and Lee Ann, age 4. On the morning of December 8, 1969, Jacquelyn Gryc, after sending Tammy to school, began doing housework around her home. She was cooking various items on three burners of an electric stove. Just prior to the accident, she set a timer situated above the stove and went down into the basement to do some laundry. At that time, Lee Ann was watching television in the living room. She was clothed in pajamas, the fabric of which was 100 percent untreated cotton flannelette manufactured by Riegel. Gerry Gryc had just risen and was getting dressed in an upstairs bedroom.

It appears that, at approximately 9:30, the timer on the stove went off, Lee Ann went into the kitchen, pulled a chair over to the stove, climbed onto it, reached above the stove, and turned off the timer. Her pajama top came in contact with a lighted burner and ignited. Her parents then heard Lee Ann scream. Jacquelyn, who had been proceeding up the back stairway to turn off the timer, ran up the stairs and saw Lee Ann standing near the top of the stairs. Lee Ann's pajama top was engulfed in flames. Jacquelyn grabbed a towel, wrapped it around Lee Ann, and extinguished the flames. It was estimated that the pajama top burned for 8 to 12 seconds before it was extinguished. Gerry Gryc ran downstairs and immediately drove Lee Ann to a nearby hospital.

Lee Ann remained in the hospital through January 1970. As a result of the incident, she suffered severe second- and third-degree burns and resultant scars on 20 percent of her body in the regions of her

arms, chest, breasts, stomach, back, neck, and chin. During her hospitalization, Lee Ann underwent skin grafting procedures. Lee Ann has additional scars on her thighs as a result of these procedures. Lee Ann's scars are permanent—her appearance cannot be improved through plastic surgery.

At trial, plaintiffs contended and presented evidence which tended to prove that the fabric used in the Gryc pajamas was defective. They claimed and their evidence tended to show that: (1) the cotton flannelette was unreasonably dangerous for use in children's sleepwear because of its highly flammable characteristics; (2) there were commercially available durable flame retardant chemicals which could have significantly increased the safety of the product; (3) there were inherently flame retardant synthetics which could have been used for children's sleepwear instead of cotton flannelette; (4) garment manufacturers, sellers, and consumers should have been warned of the flammable characteristics of the cotton flannelette; and (5) consumers should have been instructed of a simple home remedy which could have been used to flame retard the fabric after each washing.

Riegel defended the action by attempting to prove that the cotton flannelette was not unreasonably dangerous because: (1) it complied with the federal Flammable Fabrics Act; (2) no warning was necessary since cotton flannelette contained only normal and obvious hazards; and (3) the state of the art during the relevant time period was such that there were no chemical durable flame retardant chemicals available for use on cotton flannelette which would not negatively affect the fabric and make it unsaleable, and there were no available inherently retardant synthetics for use in children's sleepwear.

The pajamas worn by Lee Ann were two-piece, loose-fitting, and the pajama top flared out at the waist. The flannelette used in the pajamas was manufactured by Riegel and distributed to defendant Style Undies, Inc., on or before August 31, 1967. An employee of defendant Associated Merchandising Corporation (AMC) contacted Style Undies, Inc., about producing cotton flannelette sleepwear for children. The employee of AMC selected the fabric and design of the pajamas. After Style Undies, Inc., manufactured the pajamas, AMC distributed them to its member store, defendant Dayton-Hudson Corporation. Jacquelyn Gryc bought the pajamas at a Dayton-Hudson store in the summer or fall of 1969.

The flannelette used in Lee Ann's pajamas was woven material made from yarns spun from natural cotton fiber. The fabric was brushed on one side which created a nap. Flannelette is light weight, warm, and absorbent. It has a soft feel or "hand", breathes well, and is launderable and durable. It is relatively inexpensive. Flannelette was very popular during the relevant time period because of these qualities and was the dominant fabric used in children's winter sleepwear.

The flannelette used in Lee Ann's pajamas was not treated with any flame retardant. Its flammable characteristics were demonstrated by one of plaintiffs' expert witnesses, Dr. Robert Johnson, by film at trial. Dr. Johnson reconstructed Lee Ann's accident by making a copy of Lee Ann's pajamas, placing them on a mannequin the size of Lee Ann, and using an ignition source similar to the Gryc electric burner. The film showed that the fabric ignited instantaneously when the hem of the pajama top was placed in contact with the ignition source. The front of the pajama top burned from hem to neck in 4 to 5 seconds. The same experiment was performed on a pair of pajamas of the same design but constructed of newsprint. The newsprint pajamas burned only slightly faster than did the untreated flannelette pajamas.

Plaintiffs' experts concluded that the untreated cotton flannelette was unreasonably dangerous for use in children's sleepwear because of the instantaneous manner in which the fabric ignited, the speed at which it burned, the amount of heat produced when it burned, and the difficulty of extinguishing the flames. Defendant's experts characterized these burning characteristics as "normal" for the mass of the fabric and

as a "natural" phenomenon for cotton, the characteristics of which had not changed for hundreds of years. They concluded, therefore, that the fabric used in the Gryc pajamas was not defective.

The bulk of the testimony at trial concerned the state of the art with respect to flame-retardant processes at the time the fabric used in the Gryc pajamas was manufactured. It was not seriously disputed at trial that there were products available from the early 1950's through 1967 which were capable of being applied to lightweight cotton flannelette which would flame retard the fabric and which were durable, i. e., would remain on the fabric through 50 washings. These products were manufactured by various companies and were identified at trial by various trade names—Proban, Pyrovatix, Roxel, and Lynrus FR-1. All of these products were made from the chemical tetrakis hydromethyl phosphonium chlorida (THPC).

It was shown at trial that the safety of cotton flannelette could be significantly increased by applying this type of product to the fabric. Dr. Johnson, by film, demonstrated the flammable characteristics of flame retarded cotton flannelette. He created a pair of pajamas like those which Lee Ann had worn, except that they were treated with a flame-retardant process available in 1967. The pajamas were placed against a heat source similar to an electric burner for 30 seconds. The pajamas blackened, burned, and charred but did not flame in an area 6 inches wide and 8 inches long in that 30 seconds. When the fabric was removed from the heat source, the blackening and charring stopped.

The serious dispute between the experts concerned the availability of flame-retardant processes during the relevant time period which would not destroy the desirable characteristics of cotton flannelette. Plaintiffs' experts testified that, as early as 1962, there were flame-retardant processes which could be applied to the fabric without adversely affecting its qualities enough to make it unsaleable. Plaintiffs also showed that, in England, flannelette-like sleepwear

was required by law to be flame retarded since the 1950's.

Defendant's experts were of the opposite view. They testified that there were no durable flame retardant chemicals which could be applied to the fabric without severely reducing its tensile and tear strength, its soft feel, increasing its weight and cost, and adversely affecting the color of the fabric.

Plaintiffs' witnesses admitted that there were no mills producing flame retarded flannelette for public consumption in any volume in 1967. However, both of plaintiffs' experts testified that the flame retardant chemicals and the process for applying them could have been made commercially available as early as 1962–1966, if only the textile mills had so desired.

There was limited testimony concerning the availability of inherently flame retardant synthetics for use in children's sleepwear in 1967. Plaintiffs' expert testified that such products could have been made at that time. Defendant's experts testified that these products could not be spun finely enough to make flannelette-type yarn, were not soft, would shrink, and were unreasonably costly.

Defendant's experts contended that no warning of the flammable characteristics of cotton flannelette was necessary on the Gryc pajamas because its burning characteristics are obvious and natural for the mass of the fabric. However, plaintiffs introduced a great amount of testimony tending to show that garment manufacturers, wholesalers, retailers, and consumers were not aware of the highly flammable characteristics of untreated cotton flannelette. Their evidence tended to show that Riegel and other garment manufacturers were uniquely aware of these characteristics.

Defendant's experts were also of the opinion that a warning would not be feasible or practical because Riegel could not be assured that such a warning would get beyond the garment manufacturers. However, there was testimony that for other purposes Riegel could and did use hang tags which were sent through the chain of commerce and did reach consumers.

Defendant's experts were also of the opinion that a warning would "stigmatize" Riegel's flannelette and make it unmarketable as compared with identical flannelette from competitor mills.

Plaintiffs also claimed that defendant Riegel should have instructed consumers of a home remedy which would temporarily flame retard flannelette pajamas. This remedy, a water base solution of boric acid and borax, would come out in the wash, but could be simply sprinkled on clothing after each washing. Dr. Johnson conducted a test with a pair of flannelette pajamas treated with such a solution. The pajamas did not ignite when they were held against a hot plate for 5 seconds.

The issues presented on this appeal are:

(1) Whether the award of punitive damages is an appropriate remedy in a products liability case;

(2) Whether defendant's compliance with an applicable federal safety standard precludes a punitive damages award;

(3) Whether the imposition of punitive damages on a defendant who has complied with the federal Flammable Fabrics Act is prohibited by the preemption provision of that Act or by the Supremacy Clause of the United States Constitution;

(4) Whether the trial court applied the proper legal standard in instructing the jury on the issue of punitive damages;

(5) Whether there was sufficient evidence to support the award of punitive damages in this case;

(6) Whether policy considerations dictate against an award of punitive damages in this case;

(7) Whether the award of $1,000,000 in punitive damages is excessive;

(8) Whether there was sufficient evidence to support a finding that defendant manufactured a defective product and that plaintiffs were not aware of the defect;

(9) Whether the jury verdict was perverse when it found defendant Riegel to have caused plaintiffs' injuries while at the same time finding that the other defendants in the stream of commerce did not cause those injuries;

(10) Whether defendant was prejudiced by the trial court's dismissal of defendant's counterclaim against Jacquelyn Gryc when the jury found that Jacquelyn Gryc was not at fault;

(11) Whether the trial court erred in finding that the 4-year-old child, Lee Ann Gryc, could not be comparatively at fault as a matter of law;

(12) Whether the trial court committed cumulative errors and plaintiffs' counsel engaged in misconduct which denied defendant a fair trial;

(13) Whether the award of $750,000 in compensatory damages is excessive.

■ 1. This case presents the question, not heretofore considered by this court, of whether punitive damages may be appropriately awarded in the context of a strict liability action. There is ample authority from many jurisdictions approving this remedy in strict liability cases.[1] An exhaustive article, Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich.L. Rev. 1258 (1976), discusses the pros and cons of allowing such an award. The author concludes that punitive damages are an appropriate remedy in such cases based on the following rationale:

Manufacturers have a powerful hold over the means for discovering and correcting product hazards. Through the

---

1. *See Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132 (3rd Cir. 1973); *Gillham v. Admiral Corp.*, 523 F.2d 102 (6th Cir. 1975), cert. denied, 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976); *Boehm v. Fox*, 473 F.2d 445 (10th Cir. 1973); *Maxey v. Freightliner Corp.*, 450 F.Supp. 955 (N.D.Tex.1978); *Drake v. Wham-O Mfg. Co.*, 373 F.Supp. 608 (E.D.Wis.1974); *Sturm, Ruger & Co. v. Day*, 594 P.2d 38 (Alaska 1979); *Toole v. Richardson-Merrell, Inc.*, 251 Cal.App.2d 689, 60 Cal.Rptr. 398 (1967); *Moore v. Jewel Tea Co.*, 116 Ill.App.2d 109, 253 N.E.2d 636 (1969), aff'd, 46 Ill.2d 288, 263 N.E.2d 103 (1970); *Rinker v. Ford Motor Co.*, 567 S.W.2d 655 (Mo.App.1978). *But see Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832 (2nd Cir. 1967).

processes of design, testing, inspection and collection of data on product safety performance in the field, the manufacturer has virtually exclusive access to much of the information necessary for effective control of dangers facing product consumers. * * *

Most manufacturers, both from a desire to avoid liability and from a generalized sense of social responsibility, prudently use their resources to prevent excessively hazardous products from reaching or staying on the market. On occasion, however, manufacturers abuse their control over safety information and market defective products in flagrant disregard of the public safety. * * * A legal tool is needed that will help to expose this type of gross misconduct, punish those manufacturers guilty of such flagrant misbehavior, and deter all manufacturers from acting with similar disregard for the public welfare. The punitive damages remedy is such a tool.

*Id.* at 1258–60.

Based on this rationale, we recognize today that punitive damages, in an appropriate case, may properly be awarded in a strict liability action.

■ 2. The Flammable Fabrics Act of 1953, Chap. 164, § 4, 67 Stat. 111, as amended, Chap. 833, 68 Stat. 770 (1954), in effect at the time this cause of action arose,[2] applied to fabrics sold in interstate commerce for wearing apparel. This statute sets forth a test to determine whether a fabric is dangerous when used in clothing. This test, termed CS 191–53, requires that sample fabrics be dried out and cut into 2-inch by 6-inch lengths. The samples are mounted in an enclosed testing box at a 45° angle. The sample is then impinged with a standard ⅝ inch flame at the top of the fabric for 1 second. If the fabric ignites, the number of seconds it takes the flame to burn 5 inches is measured. A napped fabric which does not ignite in 1 second or which ignites and burns 5 inches in more than 4 seconds is considered to be of intermediate flammability, passes the test, and may be used in wearing apparel. *See* 16 C.F.R. §§ 1610.3(2), 1610.4 (1977).

The fabric in the Gryc pajamas passed the CS 191–53 test. The fabric did not ignite in 1 second and when a forced ignition test was used, the fabric ignited in an average time of 1.8 seconds and the average burning time was 9.8 seconds. Therefore, under the Flammable Fabrics Act, the Riegel flannelette was properly saleable in interstate commerce.

Riegel argues that its compliance with the federal Act precludes, as a matter of law, a finding of that guilty state of mind which is a necessary prerequisite to a punitive damages award. It argues that it was justified in relying on the Act in determining which fabrics were safe for dissemination in the marketplace. The trial court addressed this issue in its post-trial memorandum and found:

> The difficulty with [Riegel's] argument is that it does not assess the validity of the test. It was proven almost conclusively at trial that this test did not and could not properly determine the flammability of fabrics such as cotton flannelette. Moreover, it was almost conclusively established, in addition, that defendant Riegel knew not only that the test was invalid but that it could not evaluate the flammability of its products * * *. Knowing full well at all times after the passage of the Flammable Fabrics Act that CS 191–53 was unreliable, the defendant cannot today say that punitive damages should not be allowed simply because its cotton flannelette passed an unreliable test. Riegel's argument that it had a right to act on the basis of the legislation * * * is a specious one, because such actions were not taken in good faith and must be viewed in the context of the knowledge that Riegel had that its cotton flannelette was extremely dangerous to the public because of its racing flammability.

2. The Flammable Fabrics Act was subsequently amended to provide for more stringent regulation of fabric used for children's sleepwear. However, these revisions are inapplicable to this cause of action.

On reviewing the record, we have determined that the trial court's findings are supported by the evidence and that its conclusions are correct. There was substantial evidence at trial which established that the CS 191–53 test was not a valid indicator of the flammable characteristics of fabrics and did not take into account the uses to which a fabric would be put in determining its safety.[3] It was shown that newspaper passed the CS 191–53 test with a 48-percent margin of safety.

It was also shown that the original intent of Congress in passing the CS 191–53 test into law was primarily to protect the public against certain highly flammable synthetic products, not all unreasonably dangerous clothing. 1953 U.S.Code Cong. & Admin. News, p. 1723.[4]

Furthermore, there was evidence that the test was adopted as a result of industry influence and, therefore, served to protect the textile industry rather than the public. It was the textile industry which originally formulated the test, and in 1960 one of Riegel's vice presidents stated:

> The AATCC [American Association of Textile Chemists and Colorists] not only developed an adequate testing mechanism, *but was instrumental in guiding the government toward drawing up regulations and specifications.* [Emphasis added.]

The evidence established that Riegel knew of the invalidity of the CS 191–53 test and was aware that unreasonably dangerous fabrics passed the test. Riegel's head of research, Linton C. Reynolds, knew that newspaper and 19 other samples of paper passed the CS 191–53 test and communicated this to a Riegel top official. In addition, Riegel knew that persons were suffering severe burn injuries when Riegel's flannelette ignited. In 1956, one of Riegel's top officials wrote in a memorandum, "We are always sitting on somewhat of a powder keg as regards our flannelette being so inflammable." The memorandum was entitled "Flammability—Liability."

Several courts have addressed the issue of whether compliance with the CS 191–53 test precludes liability for compensatory damages as a matter of law and have concluded that it does not. *See Raymond v. Riegel Textile Corporation*, 484 F.2d 1025 (1st Cir. 1973); *LaGorga v. Kroger Co.*, 275 F.Supp. 373 (W.D.Pa.1967), *aff'd*, 407 F.2d 671 (3rd Cir. 1969); *Howard v. McCrory Corp.*, 601 F.2d 133 (4th Cir. 1979); *Sherman v. M. Lowenstein & Sons, Inc.*, 28 App.Div.2d 922, 282 N.Y.S.2d 142 (1967). These courts reasoned that since it was shown that the test was invalid, compliance with that test did not preclude a finding that a product was unreasonably dangerous. For the same reason, we conclude that while compliance with this test may be relevant to the issue of punitive damages, it

3. The commentators have agreed. *See* Swartz, *Product Liability: The Torch Cases*, 76 Case & Comment, No. 1, p. 3 (1971); Comment, *Dressed to Kill: The Flammable Fabrics Act of 1953*, 4 Cum.-Sam.L.Rev. 358 (1973); Note, *The Human Torch—An Exegesis About the Clothes We Wear*, 23 S.S.C.L.Rev. 787 (1971); Note, *Flammable Fabrics Act Protection: Fire Resistants v. Industry Resistance*, 39 Geo.Wash.L. Rev. 608 (1971); Campbell & Vargo, *The Flammable Fabrics Act and Strict Liability in Tort*, 9 Ind.L.Rev. 395 (1976).

4. In 1967, the Consumer Subcommittee of the Senate Committee on Commerce, in discussing the need for amendments to the federal Flammability Act, noted:

> Congress enacted the Flammable Fabrics Act (which became effective on July 1, 1954) to protect the public from newly introduced highly flammable clothing, including "torch sweaters" and certain children's cowboy chaps. Congress set the level of protection by incorporating fixed standards of flammability into the Act. These fixed standards were stringent enough to halt the marketing of the highly flammable articles of clothing noted above, but did not affect the marketing of most materials and articles of clothing that were then—and are still now—commonly in use.
>
> Therefore, while the Act has been successful in preventing the marketing of newer highly flammable materials, thereby preventing a likely increase in clothing fire injury and death rates, it has not reduced those rates—they remain unabated.

*To Amend the Flammable Fabrics Act: Hearings on S.1003 before Consumer Subcomm. of the Senate Comm. on Commerce*, 90th Cong., 1st Sess. 7 (1967).

does not preclude such an award as a matter of law.

■ 3. In 1967, the Flammable Fabrics Act was amended to include the following preemption provision:

This Act is intended to supersede any law of any State or political subdivision thereof inconsistent with its provisions.

Flammable Fabrics Act, Pub.L. No. 90–189, § 16, 81 Stat. 568. Riegel contends that the imposition of punitive damages on a defendant who has complied with the Flammable Fabrics Act constitutes an inconsistent state law which is preempted by the Act. Riegel argues, therefore, that the punitive damages award in this case is violative of the Act and the Supremacy Clause of the United States Constitution.

In the case of *Northern States Power Co. v. Minnesota*, 447 F.2d 1143, 1146–47 (8th Cir. 1971), *aff'd*, 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), the Eighth Circuit succinctly stated the general framework of analysis to be applied in determining whether a particular state law is preempted by federal legislation:

Once it is ascertained that the federal government possesses the power to regulate in a given area, the question is whether Congress has exercised its power of legislation in such a manner as to exclude the states from asserting concurrent jurisdiction over the same subject matter.

First, as the Supreme Court noted in *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), "[a] holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility * * *. [Citations omitted.]

Second, absent inevitable collision between the two schemes of regulation it must be determined whether Congress manifested an intent to displace coincident state regulation in a given area. Where Congress has unequivocally and expressly declared that the authority conferred by it shall be exclusive, then there is no doubt but that states cannot exert concomitant or supplementary regulatory authority over the identical activity. [Citations omitted.]

Third, even where Congress has not expressly prohibited dual regulation nor unequivocally declared its exclusionary exercise of authority over a particular subject matter, federal preemption may be implied. [Citations omitted.] Key factors in the determination of whether Congress has, by implication, preempted a particular area so as to preclude state attempts at dual regulation include, *inter alia*: (1) the aim and intent of Congress as revealed by the statute itself and its legislative history, [Citations omitted]; (2) the pervasiveness of the federal regulatory scheme as authorized and directed by the legislation and as carried into effect by the federal administrative agency, [Citations omitted]; (3) the nature of the subject matter regulated and whether it is one which demands "exclusive federal regulation in order to achieve uniformity vital to national interests." [Citations omitted]; and ultimately (4) "whether, under the circumstances of (a) particular case (state) law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." [Citations omitted.]

It is evident that Congress properly promulgated the Flammable Fabrics Act pursuant to the Commerce Clause power granted to it by the United States Constitution. Therefore, we must first determine whether Congress expressly intended, by the Act's preemption provision, to preclude the state private remedy of punitive damages.

The stated purpose of this preemption provision was to preclude the multiple regulation of textile manufacturers by providing a "uniform" federal regulation. Report of the Senate Commerce Committee, 113 Cong.Rec. 20328 (1967). Riegel argues that the punitive damages remedy serves to frustrate this stated purpose by imposing a higher duty on a textile manufacturer than is required by the federal Act. The puni-

tive damages remedy serves to punish a textile manufacturer for and deter that manufacturer from willfully, wantonly, or maliciously marketing a fabric which is unreasonably dangerous under state law. As such, it does place a higher duty on a manufacturer by requiring it to forbear from selling such a fabric even though that fabric is in compliance with the Flammable Fabrics Act. However, we have determined upon reviewing the federal statute and its legislative history that the punitive damages remedy is not the type of inconsistent state law which Congress expressly intended to preempt.

It is clear that the imposition of punitive damages on a manufacturer who has complied with the Act is not inconsistent with that Act in the sense that it would be impossible for a textile manufacturer to comply with the state-established duty and at the same time comply with the federal Act. The punitive damages remedy merely serves to impose a higher duty on that manufacturer.

It appears that the preemption provision of the Act, as originally drawn, was given varying interpretations. Some viewed the Act as merely establishing minimum safety standards while others viewed it as establishing a mandatory national requirement. 1976 U.S.Code Cong. & Admin.News, pp. 1003–4. In response to this confusion, Congress enacted an amendment to the 1967 preemption provision which was intended to clarify it and was designed to meet the competing interests of those who viewed the Act as setting mere minimum requirements and those who opted for a uniform requirement. *Id.* The 1976 amendment to the preemption provision, Flammable Fabrics Act, 15 U.S.C.A. § 1203 (West, 1979), provides in part:

> (a) Except as provided in subsections (b) and (c) of this section, whenever a flammability standard or other regulation for a fabric * * * is in effect under this chapter, no State or political subdivision of a State may establish or continue in effect a flammability standard or other regulation for such fabric * * * if

the standard or other regulation is designed to protect against the same risk of occurrence of fire with respect to which the standard or other regulation under this chapter is in effect unless the State or political subdivision standard or other regulation is identical to the Federal standard or other regulation.

> \* \* \* \* \* \*

> (c)(1) Upon application of a State or political subdivision of a State, the Commission may * * * exempt from subsection (a) * * * any flammability standard or other regulation of such State or political subdivision applicable to a fabric * * * subject to a standard or other regulation in effect under this chapter, if—

> (A) compliance with the State * * requirement would not cause the fabric * * * to be in violation of the standard or other regulation in effect under this chapter, and

> (B) the State * * * standard * * (i) provides a significantly higher degree of protection from the risk of occurrence of fire * *· *, and (ii) does not unduly burden interstate commerce.

The original 1967 preemption provision is ambiguous in that it does not expressly state which types of state action are preempted by the Act. It merely states that all inconsistent state *laws* are preempted. However, the 1976 amendment clarifies this ambiguity by replacing the term "law" with "flammability standard or regulation." This suggests that Congress merely intended to preempt inconsistent state statutory enactments rather than all state laws. This conclusion is bolstered by the legislative history under both the 1967 and 1976 preemption amendments. This legislative history indicates that Congress only intended to preclude inconsistent state statutory law which *sought to establish specific regulations in the area of flammable fabrics. To Amend the Flammable Fabrics Act: Hearings on S.1003 before the Consumer Subcomm. of the Senate Comm. on Commerce,* 90th Cong., 1st Sess. 157 (1967); 1976 U.S. Code Cong. & Admin.News 1009–10.

Therefore, we find that Congress did not expressly intend to preempt state private civil remedies by its preemption provision.

However, this does not end our inquiry. We must also determine whether preemption of the punitive damages remedy may be implied from the federal Act. There is some indication that Congress specifically did not intend to preempt any private civil remedies. First, 15 U.S.C.A. § 1199 (West, 1974), a subdivision of the Flammable Fabrics Act, provides in part:

> The provisions of this chapter shall be held in addition to, and not in substitution for or limitation of, the provisions of any other law.

It is arguable that this provision seeks to leave intact any state law which is not expressly precluded by the preemption provision. *See generally American Apparel Manufacturers Ass'n v. Sargent*, 384 F.Supp. 289, 290–91, n. 4 (D.Mass.1974).

Furthermore, another federal act, although not directly applicable to the instant matter, is helpful in giving an indication of congressional intent in this area. In 1972, Congress enacted the Consumer Product Safety Act, 15 U.S.C.A. § 2051 et seq. (West, 1974). Congress made this Act applicable to the Flammable Fabrics Act by delegating the function of promulgating rules and regulations under the Flammable Fabrics Act to the Consumer Product Safety Commission, 15 U.S.C.A. § 2079. Section 2074(a) of that Act, entitled "Private Remedies," explicitly leaves intact liability at common law:

> Compliance with consumer product safety rules or other rules or orders under this chapter shall not relieve any person from liability at common law or under State statutory law to any other person.

This section makes it clear that for any action arising after the promulgation of this Act, there is no preemption of private remedies, either compensatory or punitive. It also indicates that Congress never intended to preempt any private remedies.

The United States Supreme Court has stated that where a challenged state law concerns the vital state interest of protecting its citizens from injury, it cannot be inferred that Congress deprived the states of the power to act in the absence of compelled congressional direction. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *see Maurer v. Hamilton*, 309 U.S. 598, 60 S.Ct. 726, 84 L.Ed. 969 (1940) (state law protecting the safety of its citizens upheld although it arguably conflicted with federal law); *UAW v. Russell*, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958) (state cause of action for compensatory and punitive damages for wrongful interference with lawful occupation deemed not preempted by the National Labor Relations Act); *Linn v. United Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (state cause of action for compensatory and punitive damages for defamation upheld as not preempted by National Labor Relations Act). In *Russell* and *Linn*, the Supreme Court noted that the federal law's inability to provide for private relief, when state law was able to, vitiated the ordinary arguments for preemption. In *Linn*, the Court also stated that the federal law's inability to provide for relief aggravated the state's concern since a failure to redress an otherwise actionable wrong would create disrespect for the law.

In this case, the state punitive damages remedy concerns the vital state interest of protecting persons against personal injury. It seeks to protect state citizens from the willful, wanton, and reckless manufacture of a dangerously flammable fabric for use in children's sleepwear. The 1953 Flammable Fabrics Act did not seek to protect persons from this particular risk. As stated earlier, the purpose underlying the original Act was primarily to prohibit the sale of highly flammable synthetic materials, not all unreasonably dangerous fabrics.

Furthermore, the 1953 Act did not provide private relief for personal injuries. In *Raymond v. Riegel Textile Corp.*, 484 F.2d 1025 (1st Cir. 1973), the First Circuit determined that the imposition of compensatory damages on a defendant who had complied with the CS 191–53 test was not inconsist-

ent with or preempted by the federal Act. The court reasoned:

> The Flammable Fabrics Act provides for injunction, seizure of materials, and criminal penalties, for violation of flammability standards promulgated by the Secretary of Commerce pursuant to 15 U.S.C.A. §§ 1193 and 1201. The Act makes no provision for private relief for those harmed in accidents involving flammable fabrics.
>
>    \*      \*      \*      \*      \*      \*
>
> Since the Flammable Fabrics Act did not provide private civil remedies and does not preclude state development of such remedies, the states are not limited to applying the federal criminal and regulatory standards in civil cases involving burns from ignited fabrics.

484 F.2d at 1026–28. Although this case dealt with the preemption of the remedy of compensatory damages, its reasoning is nevertheless applicable to the punitive damages remedy.

The case of *Northern States Power Co. v. Minnesota*, 447 F.2d 1143 (8th Cir. 1971), *aff'd*, 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), is distinguishable. In that case, the court determined that a state law was preempted even though the state claimed that its law protected a vital interest in human safety. However, that case is unlike the instant matter because there the court determined that the federal government had an overriding concern in the regulation of nuclear activity. Furthermore, the federal regulation therein considered was pervasive and detailed. Additionally, the relevant federal agency had specifically sought to deal with the subject matter that the state was attempting to regulate through the issuance of a federal permit. The federal Flammable Fabrics Act of 1953 is different in nature. It does not deal with

an area of traditional federal concern. Furthermore, the federal regulation is general in nature. It originally sought to prohibit the marketing of only a limited number of fabrics. Additionally, there were never any specific regulations promulgated under this federal law. Thus, this act is unlike the federal law addressed in the *Northern States Power* case which was all-encompassing and adequately sought to deal with the safety problems surrounding nuclear activity.

Since there is no clear congressional intent to preempt the private state remedy of punitive damages, we find that such preemption cannot be implied. We, therefore, reject Riegel's preemption arguments.

█ 4. Riegel also contends that the trial court, in instructing the jury on the issue of punitive damages, applied an incorrect legal standard and burden of proof.[5] Riegel argues that a "reckless disregard" standard was improperly applied and that the burden of proof on this issue should have been one of "clear and convincing evidence" rather than a "preponderance of the evidence." Riegel presents these arguments for the first time on appeal. These arguments were not raised at trial or in Riegel's post-trial motions.

In *Baldwin v. Chicago & N. W. Ry. Co.*, 285 Minn. 15, 20, 171 N.W.2d 89, 92 (1969), this court cited with approval *Coble v. Lacey*, 252 Minn. 423, 433, 90 N.W.2d 314, 322 (1958), in which we stated the following principle:

> [D]espite errors of fundamental law or controlling principle a trial court's charge to the jury becomes the law of the case and is not subject to attack or review on appeal when such fundamental errors have not been * * * called to the attention of the trial court * * * or

---

**5.** The trial court partially instructed the jury as follows:

> [I]f you find that any of these defendants acted either maliciously or in a wilful or wanton manner, you may * * * award * * * exemplary or punitive damages * * *.

> A "wanton" act is one which is done in a reckless disregard of the rights of others, evincing reckless indifference to consequences to the life or limb or health of another * * *.

> The trial court used a preponderance of the evidence standard in instructing the jury on this issue.

have not, as a minimum requirement, been assigned for the first time as errors in motion for a new trial.

In accordance with this principle, we hold that the trial court's instructions cannot now be attacked by Riegel. The instructions constitute the law of the case and Riegel's subsequent arguments will be reviewed on the basis of the legal standard imposed by the trial court.[6]

5. In instructing the jury on the issue of punitive damages, the court listed several factors which the jury was to take into account in determining whether Riegel had acted in willful or reckless disregard of plaintiffs' rights:

1. The existence and magnitude of the product danger to the public;

2. The cost or feasibility of reducing the danger to an acceptable level;

3. The manufacturer's awareness of the danger, the magnitude of the danger, and the availability of a feasible remedy;

4. The nature and duration of, and the reasons for, the manufacturer's failure to act appropriately to discover or reduce the danger;

5. The extent to which the manufacturer purposefully created the danger;

6. The extent to which the defendants are subject to federal safety regulation;

7. The probability that compensatory damages might be awarded against defendants in other cases; and, finally,

8. The amount of time which has passed since the actions sought to be deterred.

■ We have reviewed the entire record and, after taking into consideration the above-listed factors, have concluded that there was sufficient, in fact substantial, evidence for the jury to find that Riegel acted in willful, wanton and/or malicious disregard of the rights of others in marketing its flannelette.

6. We note that 1978 Minn.Laws, c. 738, § 4, which subsequently changed the law with re-

*The Danger*

Plaintiffs introduced substantial evidence to show that thousands of people were dying or being seriously injured from clothing fires involving highly flammable fabrics each year. It was shown that the young and the very old were the most susceptible to these injuries. Furthermore, Dr. Johnson, at trial, demonstrated the instantaneous ignition and rapid burning rate of the untreated cotton flannelette manufactured by Riegel.

*The Feasibility of Reducing the Hazard*

As previously indicated, plaintiffs introduced a large amount of evidence showing that flame retardant products could have been applied to cotton flannelette well before Riegel manufactured the flannelette used in Lee Ann's pajamas. Of course, there was contrary evidence presented on this point by Riegel's witnesses, but plaintiffs' experts provided credible evidence.

■ However, even if such evidence had not been sufficient, there was sufficient evidence from which the jury could conclude that Riegel was strictly liable for its failure to warn.

Under Minnesota law, a manufacturer has a duty to warn users of its products of all dangers associated with those products of which it has actual or constructive knowledge. Failure to provide such warnings will render the product unreasonably dangerous and will subject the manufacturer to liability for damages under strict liability in tort.

*Karjala v. Johns-Manville Products Corp.,* 523 F.2d 155, 158 (8th Cir. 1975); *see Magnuson v. Rupp Manufacturing, Inc.,* 285 Minn. 32, 38, 171 N.W.2d 201, 205 (1969). The high flammability of Riegel's cotton flannelette is itself evidence of its duty in this regard. Furthermore, there was substantial evidence that Riegel was uniquely aware of these flammable characteristics.

Riegel did not seriously argue at trial that it was unable to provide a warning to the consumer, nor could it because plaintiffs

spect to the legal standard for punitive damages, is not applicable in this case.

introduced evidence that Riegel was able to send advertising information concerning the positive attributes of its product through the chain of commerce.

Riegel mainly argued at trial and argues here on appeal that it was not feasible to warn consumers because such a warning would "stigmatize" its product, thereby seemingly admitting that it was protecting the marketing of a product consumers might deem unreasonably hazardous.

*Riegel's Knowledge*

Riegel's knowledge of the hazard involved and its reason for not taking feasible measures to reduce this hazard was demonstrated at trial. In 1956, one of Riegel's top officials sent to the Riegel head of research a memorandum listing a number of clothing fires and consequent injuries which occurred to persons wearing Riegel flannelette garments. This memorandum stated that the company was sitting on a "powder keg" with respect to the flammability of their flannelette. It was also proven at trial that between 1960 and 1967, Riegel was on notice that approximately 6 lawsuits were brought against it for accidents involving its cotton flannelette.

Riegel introduced a great amount of evidence showing its communications with several chemical companies concerning the availability of flame retardant products and the application of these products to its cotton flannelette. Riegel apparently introduced these items in an effort to show its good faith in attempting to find and apply a viable flame retardant to its cotton flannelette. However, one of Riegel's own letters evidences the reason for its failure in this area. In April 1968, a letter from an official of Riegel explained that satisfactory runs were made with flame-retarded flannelette using various chemicals, but that Riegel was not going to use these products until federal law so required because of the cost factor. Plaintiffs' witnesses testified that the cost of flame-retardant fabrics

would not make them unmarketable. Thus, it may be inferred from this letter that the decision not to use flame-retardant cotton flannelette was merely an economic one for the benefit of Riegel.

Plaintiffs' evidence also tended to prove that while Riegel conducted some surveillance of developments in the flame-retardant field, its efforts were minimal. Plaintiffs introduced evidence that prior to 1965, Riegel kept no records on its research and development of nonflammable products and fabrics. Furthermore, from 1967 to 1969, $140,000 was spent on research in this area while the entire research and development spending of the company amounted to $1,831,731.

■ 6. Riegel contends that various policy considerations dictate against an award of punitive damages in this case. It argues that, in products liability cases where there is a potential for multiple plaintiffs, over-severe admonition and severe economic hardship may result if punitive damages awards are allowed. This same criticism was made by Judge Friendly in the case of *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 838-9 (2nd Cir. 1967). However, this argument has been consistently rejected by other courts and commentators who have considered this issue.[7] Owen discusses this point as follows:

> [A] contrary conclusion can be drawn from the MER/29 litigation, the only mass disaster products liability litigation that has run its course. While some 1,500 claims were filed against the manufacturer in that case, only eleven were tried to a jury verdict. Out of these, only seven were decided for the plaintiff, and only three of these included awards for punitive damages, one of which was reversed on appeal. No doubt many claims were settled out of court. Yet if this is an example of the most crushing punishment that will befall a manufacturer guilty of flagrant marketing misbehavior—and it

---

7. *See Drake v. Wham-O Mfg. Co.*, 373 F.Supp. 608 (E.D.Wis.1974); *Sturm, Ruger & Co. v. Day*, 594 P.2d 38 (Alaska 1979); *Toole v. Richardson-Merrell, Inc.*, 251 Cal.App.2d 689, 60 Cal.Rptr. 398 (1967); *Rinker v. Ford Motor Co.*, 567 S.W.2d 655 (Mo.Ct.App.1978); Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich.L.Rev. 1257 (1976).

is difficult to imagine a more extreme case of such misbehavior than that of Richardson-Merrell in marketing MER/29—then the threat of bankrupting a manufacturer with punitive damage awards in mass disaster litigation appears to be more theoretical than real.

74 Mich.L.Rev. at 1324–25.

Moreover, since Riegel's wealth or poverty and the degree to which it has already been punished was relevant in this case and will be relevant in future actions against it, Riegel is adequately protected against being overly punished for its misconduct.

Riegel also argues that there is no need for the deterrent of punitive damages in this case. Riegel contends that compensatory damages and loss of sales and reputation act as an adequate deterrent. Riegel also posits that since it no longer manufactures cotton flannelette and since the Flammable Fabrics Act presently has more stringent standards for children's sleepwear, no deterrent is needed. This argument ignores the fact that Riegel was shown to have acted in reckless disregard of the public for purely economic reasons in the past. A punitive damages award serves to deter Riegel from acting in a similar manner with respect to other products manufactured by it in the future. Furthermore, since the potential of compensatory damages awards and loss of sales and reputation did not serve to deter Riegel in the past, Riegel cannot now argue that these considerations act as an adequate deterrent.

Riegel also overlooks the fact that one of the functions of a punitive damages award is to punish past misconduct. This function is well served by a punitive damages award in this case.

■ 7. Riegel contends that the punitive damages award of $1,000,000 was clearly excessive. This court has stated that it will not disturb a punitive damages award unless it appears that the award was actuated by passion and prejudice and is so excessive as to be deemed unreasonable. *Hammerstein v. Reiling*, 262 Minn. 200, 115 N.W.2d 259 (1962). We have reviewed the record in this case and find that the puni-

tive damages award is not unreasonable in light of the evidence presented.

The evidence shows that Riegel created a substantial danger to the public by marketing its highly flammable cotton flannelette. Riegel continued to market this product even though there were economically feasible measures which could have been taken to reduce this danger to a fairly acceptable level. The evidence also showed that Riegel was aware of the danger and the means for reducing this danger. Furthermore, Riegel is a multi-million dollar corporation which reaped substantial profits through the sale of its highly flammable cotton flannelette. We, therefore, do not find that the punitive damages award was excessive as as matter of law.

■ 8. Riegel argues that, under the principle of *Magnuson v. Rupp Manufacturing, Inc.*, 285 Minn. 32, 171 N.W.2d 201 (1969), Riegel cannot be held strictly liable in this case. In *Magnuson*, this court held that, in a strict liability case, a *"plaintiff must not be aware of the defect in order to recover."* 285 Minn. at 40, 171 N.W.2d at 207. Riegel claims that since Jacquelyn admitted at trial that she was aware that fabric burns, and since cotton fabric is a "natural", commonly-used product which everyone knows will burn, liability is precluded.

The argument misconstrues the nature of the claimed defect in this case. Plaintiffs claimed that Riegel's untreated cotton flannelette was defective not simply because it burned but because it was of such a construction that it ignited instantaneously and burned at an amazing degree of rapidity and at an extremely high temperature. They presented evidence tending to establish that the consuming public was unaware of these extremely flammable characteristics. It is certainly inferable that the consuming public was not aware that Riegel's flannelette had substantially similar burning characteristics to newspaper. Thus, the jury was justified in finding that Riegel manufactured a defective product and that the defect was unknown to plaintiffs and the consuming public.

■ 9. In a special interrogatory, the jury was asked whether the cotton flannelette was defective when it left the possession of Riegel and whether that defect caused the injuries to Lee Ann. In subsequent interrogatories, the jury was asked whether the cotton flannelette *pajamas* were defective when they left the control of the settling defendants—the garment manufacturer (Style Undies, Inc.), the wholesaler (Associated Merchandising Corporation [AMC]), and the retailer (Dayton-Hudson Corporation.)[8] The jury found that the flannelette was defective when it left the control of Riegel and that this defect caused Lee Ann's injuries. It also found that the flannelette *pajamas* were defective when they left the control of the settling defendants, but that this defect did *not* cause the injuries.

Riegel argues that these jury findings are inconsistent because the defect which the jury found not to have caused the injuries with respect to the settling defendants *must have been* the same defect which the jury found to have caused the injuries with respect to Riegel.

The trial court, in its post-trial memorandum, explained why the opposite findings on the cause question are consistent in this case:

The defendant Riegel was found to be strictly liable for producing a defective material which caused the injuries to Lee Ann Gryc. The liability of Riegel was on the basis of the fabric alone. The Court changed the questions for the defendants Dayton's, AMC, and Style Undies so that the jury would have an opportunity to determine whether there might be some liability on the part of these defendants for having changed the fabric in some way, or for the manner in which they moved it through the stream of commerce, which might have caused the injury to Lee Ann. The Court was careful to change the questions relating to the settling defendants from cotton flannelette

which left the possession of Riegel to cotton flannelette pajamas which left the possession of the various other defendants, thus giving the jury the opportunity to determine whether design features in the pajamas or anything else may have caused the injury to Lee Ann. The jury, with unusual discernment, realized that the cotton flannelette moved through the stream of commerce, but that it was the cotton flannelette in its highly flammable state which caused the injury, not the movement through the stream of commerce. It also recognized that the design of the pajamas had nothing to do with causing the injury to Lee Ann, and, consequently, it correctly answered Questions 3, 5, and 7 Yes, thus finding that the pajamas were in a defective condition unreasonably dangerous to consumers because of the condition of the fabric alone, and also correctly answered Questions 4, 6, and 8 No, thus finding that nothing the other defendants had done was a cause of the injury to Lee Ann.

The trial court's findings are consistent with the evidence adduced at trial. The jury verdict will not, therefore, be disturbed.

■ 10. During the trial, the trial court ruled as a matter of law that Jacquelyn Gryc could not be comparatively at fault for the claimed injuries to her daughter, Lee Ann. It based this ruling on the doctrine of parent-child tort immunity. The court, therefore, dismissed Riegel's counterclaim against Jacquelyn Gryc with respect to Lee Ann's claim. However, the question of Jacquelyn's comparative fault was submitted to the jury with respect to Jacquelyn's individual claim. The jury found Jacquelyn not to be at fault and awarded her $1,000 in damages.

Riegel claims that the trial court erroneously determined that Jacquelyn Gryc was immune from fault for her daughter's

---

**8.** Defendants Style Undies, Inc., AMC, and Dayton-Hudson Corporation all settled with plaintiffs prior to trial and Perringer releases were given. Therefore, special interrogatories were asked of the jury concerning those defendants so that each defendant's fault could be compared.

claim. The question of Jacquelyn's comparative fault was submitted to the jury even though in the context of another claim. The jury found her to be free from fault. It would have been inconsistent if the jury had found Jacquelyn comparatively at fault in the context of one claim but not the other. Therefore, the jury's finding of non-fault is equally applicable to both claims and there could not be harmful error in the dismissal of the counterclaim.

11. Prior to the conclusion of the trial, the trial court directed a verdict in favor of Lee Ann on the issue of her comparative fault. The court, however, submitted the question of Lee Ann's fault to the jury so that the need for a retrial would be obviated in the event that this court reversed the trial court on this point. The jury returned a verdict finding Lee Ann 10-percent at fault. In light of its prior ruling, the trial court found Riegel to be 100 percent at fault.

The trial court ruled that Lee Ann could not be at fault as a matter of law on the basis of *Toetschinger v. Ihnot*, 312 Minn. 59, 250 N.W.2d 204 (1977). In *Toetschinger*, this court held, in a 5–4 decision, that the plaintiff, a boy of approximately 5½ years, could be found to be 80-percent negligent for darting out into the street in front of a moving vehicle. In so holding, the majority refused to adopt the "Illinois Rule" that a child of less than 7 years in age could not be contributorily negligent as a matter of law. However, the court limited its holding by the following statement:

> The trial judge, who has the opportunity of observing the situation firsthand, can direct that the child involved, because of tender years, inexperience, or the subleties of the danger to be apprehended, cannot be held to be contributorily negligent under the circumstances of the given case.

312 Minn. at 69, 250 N.W.2d at 210.

Riegel argues that the facts of this case are analogous to those of *Toetschinger*. In *Toetschinger*, the majority based its holding on the finding that a 5½-year-old child had the capacity to appreciate and avoid the risks of moving traffic. Riegel argues that in this case, Lee Ann, a child of 4 years, 10½ months, was capable of understanding the danger incident to being near or on a stove. However, the relevant danger in this case is not simply the danger of being near a stove. The danger to be comprehended was the highly flammable nature of the cotton flannelette pajamas worn by Lee Ann. It was within the sound discretion of the trial court to determine that Lee Ann was incapable of appreciating the risks attendant upon her actions; namely, that her pajamas would ignite immediately and burn rapidly when they came in contact with the electric burner. Therefore, we uphold the trial court's determination that Lee Ann was not comparatively at fault as a matter of law.

12. Riegel claims that the trial court committed numerous other errors at trial. Riegel also contends that plaintiffs' counsel engaged in many acts of misconduct which served to deny Riegel a fair trial. We have reviewed these contentions carefully and find that Riegel's arguments are without merit.

13. Riegel argues that the compensatory damages award of $750,000 is excessive as a matter of law. However, we find the award is not so excessive as to be deemed unreasonable in light of the evidence presented.

As a result of the incident, Lee Ann suffered second- and third-degree burns over a 20-percent area of her body. Lee Ann was hospitalized for her injuries and went through painful skin grafting procedures. She underwent other treatment procedures which continued for 2 months after she was released from the hospital. During the early treatment, Lee Ann required morphine injections for her severe pain.

Lee Ann's scars are permanent. The scar tissue is different from normal skin in that it is less elastic and of a different color. The skin is about one-half the thickness of normal skin and has no hair follicles, lubricating and sweat glands, or sensory apparatus. There is a distinct asymmetry in the

development of Lee Ann's breasts as a result of her scars. The right breast is significantly smaller than the other and there is particular destruction of the right nipple. Lee Ann will require at least six episodes of surgery in her adult life because there will be future breakdowns in the scar tissue and because there is a possibility of future ulcerations and other benign or malignant growths.

The testimony indicated that this permanent disfigurement may adversely affect Lee Ann's psychological makeup, and her employment and matrimonial opportunities. The evidence also showed that Lee Ann is presently a constricted girl who has a low self-image and is unable to deal with the emotional problems caused by her burns. Lee Ann's nicknames at school are "Kentucky Fried Chicken" and "burnt toast."

Plaintiffs' testimony indicated that the sum total of Lee Ann's future medical costs relating to her injuries would be in the area of $8,500. Therefore, we are not unmindful of the fact that a large portion of the jury award is attributable to pain and suffering damages. However, when this award is viewed in the context of the severe disfigurement which Lee Ann will have to live with for the rest of her life, this award cannot be found to be excessive as a matter of law.

The judgment is, therefore, affirmed.

Affirmed.